# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 01-2518

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | Western District of Missouri. |
| Myron C. Piggie, | * | |
| | * | |
| Appellant. | * | |

_____

Submitted: June 13, 2002

Filed: September 16, 2002
_____

Before RILEY, BEAM, and MELLOY, Circuit Judges.
_____

RILEY, Circuit Judge.

In the mid to late 1990's, Myron Piggie (Piggie) created and pursued a secret scheme to pay talented high school athletes to play basketball for his "amateur" summer team. Because the athletes intended to play college basketball, the scheme produced multiple violations of National Collegiate Athletic Association (NCAA) rules which require college athletes to be amateurs. Piggie pled guilty to one count of conspiracy to commit mail and wire fraud in violation of 18 U.S.C. § 371 and one count of failure to file an income tax return in violation of 26 U.S.C. § 7203. Piggie appeals the calculation of his sentence and the amount of the restitution award,

arguing the district court[1] misapplied the United States Sentencing Guidelines (Guidelines).

The district court based the Guidelines calculation on an evaluation and comparison of the actual and the intended losses Piggie's actions caused the high school attended by two athletes, the universities where the individual athletes were recruited, the NCAA, and the athletes. For the tax loss calculation, the district court relied on the tax loss stipulated in the plea agreement. The district court ordered restitution in the amount of $324,279.87. We affirm.

## I. BACKGROUND

Between 1995 and 1999, Myron Piggie devised a scheme to assemble elite high school basketball players and compensate them for their participation on his traveling Amateur Athletic Union (AAU) basketball team, known first as the Children's Mercy Hospital 76ers and later as the KC Rebels. The payments were designed to retain top athletes on his team, gain access to sports agents, obtain profitable sponsorship contracts, and forge ongoing relationships with players to his benefit when the athletes joined the National Basketball Association (NBA).

The pre-sentence report shows Piggie realized at least $677,760 in income through his scheme. In the plea agreement, Piggie concedes that, as a result of his fraud, he received a total of $420,401 between 1995 and 1998. Piggie received at least $184,435 from team owner Tom Grant, $159,866 from team sponsor Nike, and $76,100 from sports agents Jerome Stanley and Kevin Poston. He further planned on receiving a portion of his players' compensation when they became professional athletes.

---

[1]The Honorable Gary A. Fenner, United States District Judge for the Western District of Missouri.

-2-

Piggie received a gross income of approximately $99,100 from these sources during the 1998 calendar year, and he knowingly and willfully failed to file a tax return by April 15, 1999. Piggie also failed to file income tax returns in 1995, 1996, and 1997. In the plea agreement, the parties stipulated to a total tax loss of $67,662.69 for the period of 1995 to 1998.

Piggie took portions of the money he was receiving as the coach of this elite AAU team and made payments to the high school athletes in a clandestine manner, frequently hiding the money in Nike shoe boxes. All of the parties intended to keep the payments a secret from authorities. During the conspiracy, Piggie paid Jaron Rush[2] $17,000, Korleone Young (Young) $14,000, Corey Maggette (Maggette) $2,000, Kareem Rush $2,300, and Andre Williams (Williams) $200.

After accepting Piggie's payments to play AAU basketball, Jaron Rush, Maggette, Kareem Rush, and Williams submitted false and fraudulent Student-Athlete Statements to the universities where they were to play intercollegiate basketball.[3] These four athletes falsely certified that they had not previously received payments to play basketball. The athletes delivered through the U.S. Postal Service signed letters of intent asserting their eligibility. Based upon the false assertions that these athletes were eligible amateurs, the University of California, Los Angeles (UCLA); Duke University (Duke); the University of Missouri-Columbia (Missouri); and Oklahoma State University (OSU) (collectively Universities) awarded

---

[2]Piggie spent an unnecessary portion of his brief and oral argument attempting to refute the allegation that a $5,000 payment he made to Jaron Rush was a bribe for Jaron Rush to attend UCLA instead of the University of Kansas. The reason why Jaron Rush chose to attend UCLA is irrelevant to the issues before us on appeal.

[3]Young signed a contract in 1998, directly out of high school, to play for the NBA Detroit Pistons, and did not play intercollegiate basketball.

scholarships to these athletes, enrolled them in classes, and allowed them to play on NCAA basketball teams.

NCAA regulations permit universities to award only thirteen basketball scholarships per year. When Piggie's payments to these players were discovered, the Universities became subject to NCAA penalties. Each school lost the use of one of the thirteen scholarships and lost the value of each player's participation due to the player's NCAA-required suspension. The scholarships were forfeited, and the Universities lost the opportunity to award the scholarships to other top amateur athletes, who had actual eligibility to play intercollegiate basketball. In 1999 and 2000, UCLA lost the benefit of playing Jaron Rush, the $44,862.88 scholarship awarded to him, and also forfeited $42,339 in tournament revenue; Missouri lost the benefit of playing Kareem Rush, and the $9,388.92 scholarship awarded to him; and OSU lost the benefit of playing Williams and the $12,180 scholarship awarded to him. Duke provided Maggette with a $32,696 scholarship for the 1998-1999 season based upon the false assertion that he was an eligible amateur. As a result of the ineligible athlete's participation, the validity of Duke's entire 1998-1999 season was called into question.[4]

NCAA regulations also required each of the four Universities involved to conduct costly internal investigations after Piggie's scheme was discovered. UCLA spent $59,225.36 on the NCAA-mandated investigation of Jaron Rush, Duke spent $12,704.39 on the NCAA-mandated investigation of Maggette, Missouri spent $10,609 on the NCAA-mandated investigation of Kareem Rush, and OSU spent $21,877.24 on the NCAA-mandated investigation of Williams. The total monetary loss to the Universities was $245,882.79. The scandal following the disclosure of

---

[4]Maggette played the full 1998-1999 season for Duke before Piggie's scheme was uncovered. At the time of the sentencing hearing, NCAA action against Duke was still pending. Duke was subject to the forfeiture of its second place finish in the 1999 NCAA Tournament and the loss of $226,814.51 in tournament revenue.

Piggie's scheme caused further intangible harms to the Universities including adverse publicity, diminished alumni support, merchandise sales losses, and other revenue losses.

Pembroke Hill High School (Pembroke), where Jaron and Kareem Rush played high school basketball, sustained a loss of $10,733.89 in investigative costs and forfeiture of property as a result of the conspiracy. Pembroke was placed on probation by the State of Missouri after the violations of Jaron and Kareem Rush were discovered and a mandatory investigation of the matter was concluded.

After Piggie's guilty plea, the district court sentenced him to 37 months imprisonment, three years supervised release, and $324,279.87 in restitution.

## II. DISCUSSION

Piggie contends the district court (1) miscalculated the losses, actual and intended, in determining his Guidelines base offense level; (2) erred in including consequential or incidental losses for restitution; and (3) based the tax loss calculation on insufficient evidence. We will address these issues in order.

### A. Loss Calculation

A scheme to deprive a university of its right to the "honest services" of college basketball players is within the definition of mail and wire fraud, even if it results in a winning basketball program. See United States v. Gray, 96 F.3d 769, 774-75 (5th Cir. 1996) (finding wire and mail fraud prosecution appropriate for Baylor University basketball coaches who schemed to obtain scholarships for ineligible players). The coaches' scheme in Gray was fraudulent "because Baylor did not get the quality student it expected . . . [and Baylor] might have been able to recruit other qualified, eligible students to play basketball." Id. at 775. Like the Universities and Pembroke, Baylor instead "was forced to institute a costly investigation" and withhold players from competition. Id. Piggie and his co-conspirators, the athletes, intentionally

misled the Universities into believing the athletes were amateurs. This caused each University to be deprived of the honest services of an athlete as well as the use of one of the basketball scholarships awarded annually. The scheme also directly resulted in investigative costs and fines to ensure compliance with NCAA regulations.

Piggie argues the district court incorrectly calculated the amount of loss attributable to him in enhancing his base offense level under the Guidelines. See U.S.S.G. § 2F1.1(b)(1) (2000).[5] We review the district court's interpretation and application of the Guidelines de novo. United States v. Oligmueller, 198 F.3d 669, 671 (8th Cir. 1999). Loss calculations also involve factual findings, which we review for clear error and reverse only if "we are left with the definite and firm conviction that the district court erred." United States v. Whatley, 133 F.3d 601, 606 (8th Cir. 1998).

The calculation method must be reasonable. The amount of loss "need not be determined with precision." Id. The loss determination is not limited to money handled by Piggie, but includes reasonably foreseeable losses caused by co-conspirators, which losses were part of the same conspiracy. Id. at 606-07.

In calculating the amount of loss under section 2F1.1(b)(1) of the Guidelines, the district court uses either the amount of the *actual* loss suffered by the victims or the amount of loss the defendant *intended* to cause the victims. U.S.S.G. § 2F1.1 cmt. n.8(6); United States v. Morris, 18 F.3d 562, 570 (8th Cir. 1994). In instances where the actual and intended loss are not the same amount, the district court uses whichever amount is greater. Id. In Piggie's case, the district court determined the

---

[5]The district court utilized the Guidelines in place at the time of sentencing, section 2F1.1(b)(1) of the 2000 Guidelines. In November 2001, the Sentencing Commission consolidated section 2F1.1 with section 2B1.1.

greater loss for consideration under the Guidelines was the intended loss to Pembroke and the Universities, including forfeited scholarships, investigation costs, and fines.

Piggie contends on appeal that he did not intend any loss to the Universities, because if the scheme had gone as he planned, the payments to the players would never have been discovered and the Universities would have incurred no loss. This self-serving argument fails in that it is undisputed that Piggie intended to deprive the Universities, their athletic conferences, and the NCAA of the intangible right to award scholarships to *amateur* players and maintain a system of *amateur* athletic competition. Even if his scheme had never been discovered, the Universities would have been deprived of the services of honest, amateur basketball players. We decline to accept Piggie's invitation to calculate intended losses based upon Piggie's succeeding with his fraud and deception. We agree with the district court that all of the losses to Pembroke and the Universities were "intended as the natural and probable consequences of the defendant's actions in this matter."

Piggie argues under <u>Oligmueller</u> and similar cases that the full loss to the Universities cannot be considered intended for the purpose of the Guidelines, because Piggie never intended that the Universities would suffer as a result of his scheme. <u>See Oligmueller</u>, 198 F.3d at 671; <u>see also</u> <u>United States v. Anderson</u>, 68 F.3d 1050, 1054-55 (8th Cir. 1995). In <u>Oligmueller</u>, when a farmer secured a loan using fraudulent collateral, but fully intended to pay the loan back, the *intended* loss calculation was zero and the actual loss determined the sentence. <u>Oligmueller</u>, 198 F.3d at 671. The *actual* loss calculation was the entire value of the loan reduced only by payments made from the "sale of pledged assets." <u>Id.</u> Even though the bank received value in the form of payments made with other assets, we refused to reduce the *actual* loss calculation based upon those other payments. <u>Id.</u> Even if we were convinced Piggie's intentions were analogous to the farmer's intentions in <u>Oligmueller</u>, and thus reduced the intended loss calculation, Piggie's actions still caused the actual losses in the amount of the full scholarships, fines, and investigative

fees.  The Guidelines calculation utilizes whichever loss calculation is greater. Morris, 18 F.3d at 570.  Supposing arguendo that Piggie intended the Universities to receive some value from the athletes' participation in intercollegiate basketball, Piggie's intent does not diminish the amount of *actual* loss he caused the Universities and Pembroke.

Finally, we agree with the district court that the greatest loss caused by Piggie's fraud is the most difficult to appraise – the damage Piggie did to the athletes' lives. Although Piggie's behavior does not excuse the young athletes from the bad choices they made, these high school students put their faith and trust in Piggie, counting on him to help them develop their talent.  Piggie took advantage of the trust these young athletes placed in him and exploited their immaturity and vulnerability.  Instead of acting as a positive role model to the young men in his care, Piggie led them down the path of corruption and deception.  As the district court stated, "bad decisions, wrong decisions and career-threatening and devastating decisions were caused to be made" and these decisions will no doubt have life-long repercussions for each athlete involved.

We therefore affirm the district court's loss determination.

### B.     Restitution Award

The district court ordered restitution under the Mandatory Victim's Restitution Act of 1996 (MVRA), 18 U.S.C. § 3663A.  Piggie argues for the first time on appeal that the district court committed plain error in including incidental or consequential damages in the restitution award.  Restitution orders are reviewed for plain error when the defendant does not preserve his challenge to the restitution order below. United States v. Riebold, 135 F.3d 1226, 1231 (8th Cir. 1998).  Our plain error review is "extremely narrow and is limited to those errors which are so obvious or otherwise flawed as to seriously undermine the fairness, integrity, or public reputation of judicial proceedings." United States v. Beck, 250 F.3d 1163, 1166 (8th Cir. 2001).

We do not agree with Piggie that the district court committed plain error in including the investigative costs and NCAA fines in the calculation of the restitution order, because these investigative fees and fines are not incidental or consequential damages. These losses were "caused by the specific conduct that is the basis for the offense of conviction." See United States v. Akbani, 151 F.3d 774, 780 (8th Cir. 1998) (citations omitted). The district court did not commit plain error by including the investigative fees and fines in the restitution order.

### C.     Tax Loss Calculation

Piggie argues the court clearly erred in calculating his gross unreported income and tax due. Piggie contends on appeal the amount of tax loss should have been $18,286, instead of $67,662.69 as determined by the district court. Piggie argues the government had the burden of proving the tax loss and the only documentation before the district court was the pre-sentence report, to which Piggie had objected. On the contrary, Piggie stipulated in the plea agreement that there was "a tax loss of $67,662.69 for the period of 1995-1998." A defendant who voluntarily accepts the provisions of a plea agreement cannot challenge on appeal the punishment to which he willingly exposed himself, because the defendant accepts both the benefit and the burden of the plea agreement. United States v. Durham, 963 F.2d 185, 187 (8th Cir. 1992). We find the district court's tax loss determination was not in error.

## III.    CONCLUSION

For the foregoing reasons, we affirm the opinion of the district court.


A true copy.


Attest:


CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.

-9-