**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**David PHILLIPS, Defendant–Appellant.**

**United States of America,
Plaintiff–Appellant,**

v.

**David Phillips, Defendant–Appellee.**

**Nos. 02–30035, 02–30046.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Feb. 13, 2003.

Decided Jan. 28, 2004.

Amended May 6, 2004.

Michael J. Sherwood, Michael J. Sherwood, P.C., Missoula, MT, for the defendant-appellant-cross-appellee.

Thomas L. Sansonetti, William W. Mercer, and Kris A. McLean, U.S. Attorney's Office, Missoula, MT; Linda Kato, Environmental Protection Agency, Denver, CO; and Todd Aagaard and Stephanie Tai, Department of Justice, Washington, DC, for the plaintiff-appellee-cross-appellant.

Before: BRUNETTI, T.G. NELSON, and RAWLINSON, Circuit Judges.

## ORDER

The opinion filed on January 28, 2004, and cited at 356 F.3d 1086 (9th Cir.2004), is amended as follows:

1. Pages 1100–01, paragraph beginning "Phillips' prior state prosecution," second sentence should read:

In contrast to the defendants in *Koon*, [73] who endured a full trial, Phillips endured merely a post-indictment, pre-prosecution negotiation in which he agreed to pay a fine. The state agreed not to prosecute if he paid the fine, which he did.

and continuing, "Even the defendants in *Koon* . . . ."

2. Page 1101, last paragraph of Section C beginning "The district court improperly," change the first sentence to read:

The district court improperly considered internal agency memoranda and legislative history in its heartland analysis, and the minimal legal activity Phillips endured on the state level does not merit a downward departure.

3. Pages 1102–03, last paragraph of the opinion, in the second-to-last sentence beginning "The court should not consider,"

delete the phrase "Phillips' prior state prosecution or" so the sentence reads:

The court should not consider internal agency memoranda and legislative history in its heartland analysis.

With these amendments, the panel has voted unanimously to deny the petition for panel rehearing and the petition for rehearing en banc.

The petition for rehearing and the petition for rehearing en banc are DENIED.

## OPINION

T.G. NELSON, Circuit Judge:

David Phillips appeals his criminal conviction for violating the Clean Water Act[1] ("CWA") and conspiring to violate the CWA. We disposed of many of Phillips' claims in a separate memorandum disposition. In this opinion, we reject Phillips' remaining claim: that the district court erred in refusing to dismiss the indictment for lack of jurisdiction on the ground that Fred Burr Creek (the "creek") was not a navigable water under the CWA and in so instructing the jury. Thus, we affirm Phillips' conviction.

We also address the Government's contentions that the district court erred during sentencing. We hold that a district court must consider all reliable evidence of cleanup costs in its determination of whether a defendant's actions caused a substantial expenditure for cleanup pursuant to United States Sentencing Guidelines ("U.S.S.G.") § 2Q1.3(b)(3) (2001). Additionally, we hold that the Government need only show an *attempt* to influence a witness to trigger U.S.S.G. § 3C1.1's obstruction of justice enhancement. As for the district court's U.S.S.G. § 5K2.0 heartland determination, we hold that the district

---

1. 33 U.S.C. §§ 1251–1387.

court improperly considered the defendant's prior prosecution for the same conduct, as well as internal agency memoranda and legislative history in its heartland analysis. Finally, we hold that the Government may be a victim entitled to restitution pursuant to U.S.S.G. § 5E1.1. In that context, site investigation costs necessary to determine the extent of the environmental damage and the appropriate cleanup actions may be recoverable. Accordingly, we vacate Phillips' sentence and remand for re-sentencing.

## I. FACTS AND PROCEDURAL HISTORY

A Montana jury convicted Phillips of multiple violations of the CWA and conspiracy to violate the CWA. Thus, we review the facts in the light most favorable to the Government.[2]

### A. The Development and the Investigation

In the mid–1990s, Phillips bought a large parcel of land in Montana along the creek from Ron Burgess. Phillips convinced Larry Zinger to invest in the property with the goal of subdividing it. Phillips hired Mitchell Buday and others to work on the site.

Although Phillips knew he needed a permit and did not have one, he directed his employees to dig approximately twenty ponds throughout the site. He instructed them to tell anyone who asked that they had the necessary permits.

During August 1996, Phillips wanted to show the site to potential buyers. Phillips wanted the buyer to see the site with water in the ponds. Although Phillips initially planned to fill the ponds with spring water from an old mine adit,[3] the spring's flow was too small to fill the ponds quickly. Therefore, Phillips directed Buday to breach the creek bank, divert the water through the series of ponds, and then conceal the breach. After filling the ponds, the water flowed back into the creek, dragging along sediment and old mine tailings disturbed during construction.

Phillips did not have water rights to the creek. His downstream neighbors, who owned the water rights, could not irrigate their land because the creek was running dry and was chocolate brown from the sediment. Determined to investigate, the neighbors visited the site. They could see that someone had diverted the creek and had constructed a french drain[4] in the creek bank to conceal the diversion. Although Phillips tried to convince them that he had all of the necessary permits and that the source of the pond water was the mine adit spring, they remained unconvinced. Their subsequent inquiry to the state water authorities resulted in an investigation.

Upon investigation, authorities confirmed what the neighbors reported. Creek water visibly diverted through a french drain in the creek bank filled the ponds. Inspectors saw extensive disturbance of the valley: heavy equipment tracks running through the creek, freshly constructed ponds with poorly constructed

2. *United States v. Iverson*, 162 F.3d 1015, 1018 (9th Cir.1998).

3. An adit is "a nearly horizontal opening by which a mine is entered, drained, or ventilated." WEBSTER'S THIRD NEW INT'L DICTIONARY OF THE ENGLISH LANGUAGE UNABRIDGED 26 (1986).

4. A french drain is a trench filled with coarse rock or boulders and then re-covered with dirt. Because of the rock, water may still drain through the trench.

soil berms, and a series of channels and ditches connecting the ponds to each other and then back to the creek at the bottom of the valley. Because Phillips had not properly stabilized the disturbed soil, sediment was eroding into the creek. The water washing back into the creek dragged along both sediment and mine tailings. The investigators concluded that the project site had contained jurisdictional wetlands because it exhibited typically wetland-associated vegetation and the wet areas were hydrologically connected to the creek.

Investigators contacted Zinger. Zinger, in turn, called Phillips. Phillips made it clear that if Zinger cooperated with investigators, he would be sorry: directing Zinger to "tell [the investigators] the right story," telling Zinger not to say anything more than he had to, and stating that he knew "people that can handle these things." The "story" was that Buday was in charge of the permits. Zinger initially lied to investigators about witnessing the creek diversion because he was afraid of Phillips and did not want to lose his investment.

After a series of failed efforts to get the project into compliance with state and federal environmental laws, Montana charged Phillips with environmental violations at the site. The case ultimately concluded with Phillips paying a fine. Then the Federal Government charged Phillips, Zinger, and Buday with violations of the CWA and conspiracy to violate the CWA. Phillips could not pay the contract installments owed to Burgess and agreed to return the property.

Buday pled guilty only hours before the Supreme Court decided *Solid Waste Agency of Northern Cook County v. U.S. Army Corps of Engineers* (*"SWANCC"*).[5] The *SWANCC* Court held that the Corps lacked jurisdiction to regulate isolated wetlands.[6] In light of *SWANCC*, the district court allowed Buday to submit briefing on whether jurisdiction was proper.[7] It ultimately held that it had jurisdiction because the creek was a navigable water within the meaning of the CWA.[8] Buday and Zinger cooperated with the Government and testified against Phillips.

## B. *The Pretrial Motion to Dismiss the Indictment*

In one of his many motions to dismiss the indictment, Phillips argued that the creek was not a navigable water within the meaning of the CWA, thus precluding federal jurisdiction. His theory was that, in a criminal prosecution, the court must interpret "navigable waters" as only those waters that are navigable-in-fact.

Phillips' gambit was the only way to avoid a conclusion that the creek constituted a navigable water. The parties never disputed the physical characteristics of the creek. In fact, in his supporting memorandum, Phillips' counsel stated: "Fred Burr Creek empties into Flint Creek approximately two miles from the subdivision site. Flint Creek thereafter empties into the Clark Fork River. . . . The Clark Fork River, which flows between the states of Montana and Idaho, has been designated as 'navigable.'" Thus, using Phillips' theory, although the creek was a tributary of a navigable water, this fact was insufficient for a criminal prosecution, and therefore, the court lacked jurisdiction.

---

**5.** 531 U.S. 159, 121 S.Ct. 675, 148 L.Ed.2d 576 (2001).

**6.** *Id.* at 171–74, 121 S.Ct. 675.

**7.** *United States v. Buday,* 138 F.Supp.2d 1282, 1284 (D.Mont.2001).

**8.** *Id.* at 1292.

The district court refused to dismiss the indictment, relying on *United States v. Buday,*[9] its decision in the case against Phillips' employee and co-conspirator. The court adopted its *Buday* ruling, holding that the creek was a navigable water within the meaning of the CWA.

### C. *The Trial*

Phillips was tried by a jury. In its opening statement, the Government told the jury that they would "learn ... that Fred Burr Creek comes out of the mountain, flows into Flint Creek, which ultimately flows to the Clark Fork River." The Government introduced no evidence to substantiate this statement because the court's jury instructions stated that the creek was a navigable water within the meaning of the CWA.

Phillips moved for a judgment of acquittal, arguing that the Government had failed to prove that the creek was a navigable water. The district court rejected this motion, stating:

> I believe I ruled as a matter of law in this case that, based upon my determination in *Buday,* that Fred Burr Creek is waters of the United States. I think that's equivalent to saying that the Fort Peck Indian Reservation is within the special maritime jurisdiction of the United States. The government has to prove ... that whatever the crime was happened within those jurisdictional boundaries.

> Here the question is, was Fred Burr Creek waters of the United States? As a matter of law, I have said yes.

> Now, whether it was wetlands or if it was actually in the river, I think—or the stream, whatever it is, that's a fact question that the jury's going to have to resolve.

The court's ruling did not determine whether the crime occurred in the creek or in the adjacent wetlands. The court similarly did not resolve whether the adjacent lands were wetlands.

The court gave a corresponding jury instruction on "navigable waters":

> The term navigable waters means waters of the United States. I have determined, as a matter of law, that Fred Burr Creek is a water of the United States.

> Waters of the United States also include wetlands adjacent to waters of the United States. And waters of the United States, including wetlands, do not need to be navigable-in-fact. That is, boats need not be able to navigate on them.

> The term *wetlands* means those areas that are inundated or saturated by surface or groundwater at a frequency and duration sufficient to support, and that under normal circumstances do support, a prevalence of vegetation typically adapted for life in the saturated soil conditions. Wetlands immediately adjacent to waters of the United States includes swamps, marshes, bogs and similar areas.

The jury found Phillips guilty of multiple CWA violations and conspiracy.

### D. *The Sentencing*

Before the sentencing hearing, the parties disputed what restitution the court should require and whether the court should enhance Phillips' offense level because the site cleanup "required a substantial expenditure."[10] The presentence report ultimately calculated a guideline

---

**9.** 138 F.Supp.2d 1282.

**10.** U.S.S.G. § 2Q1.3(b)(3) (requiring an enhancement if "cleanup required a substantial expenditure").

range of 33 to 41 months based upon a total offense level of 20 and a criminal history of I, and recommended restitution in an unspecified amount. The report identified $834,000.00 in total losses, consisting of $92,000.00 to Burgess, $190,000.00 to the Environmental Protection Agency's ("EPA") Emergency Response Division, and $552,000.00 to restore the damaged wetlands to their original condition. The parties disputed the total losses. The report recommended that the district court make a factual finding on the appropriate amount of restitution and whether to enhance the sentence for substantial cleanup pursuant to U.S.S.G. § 2Q1.3(b)(3).

After the sentencing hearing, the district court refused to adjust Phillips' offense level for substantial cleanup expenditure. The court found that Phillips' activities may have released mine tailings into the environment, but that Phillips did not put the tailings there in the first place. Accordingly, the court determined that cleanup was required, but concluded that "the most significant aspect of any [cleanup] that might be [required] cannot be related to the offense of conviction" because it was required pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 [11] ("CERCLA"). Therefore, although the Government presented evidence of a CERCLA cleanup, the court excluded it from the cleanup calculation.

After excluding all CERCLA-related expenses and unreliable cleanup estimates, the court held that the only known non CERCLA cleanup expenditure was $43,000.00 in costs to Burgess.[12] Looking to U.S.S.G. § 2Q1.3(b)(3), the court found that $43,000.00 was insubstantial and refused to increase Phillips' offense level.

In a related decision, the district court imposed $43,000.00 in restitution to Burgess. The court rested its holding on three grounds. First, Burgess's expenses were reliable. Second, the court concluded that the Government was not a victim and that the costs of investigation were not recoverable pursuant to U.S.S.G. § 5E1.1.[13] Third, consistent with its earlier ruling, it excluded CERCLA-related expenses entirely from its restitution calculation.

Contrary to the presentence report's recommendation, the district court refused to increase Phillips' offense level for obstruction of justice based upon his conversations with Zinger.[14] First, the court concluded that Zinger made his own inferences and drew his own conclusions about Phillips' statements—Phillips did not make any "direct statement . . . that would have caused [Zinger] to perceive a threat or an effort to obstruct justice." Second, the court concluded that the enhancement required a *material* obstructive effort. Accordingly, the court refused to enhance Phillips' sentence because he did not "materially affect[ ] or impede[ ] the . . . investigation."

---

11. 42 U.S.C. §§ 9601–9675.

12. Because Phillips returned the property, Burgess was the current owner and had incurred expenses cleaning up the property.

13. U.S.S.G. § 5E1.1 (requiring district courts to order restitution "for the full amount of the victim's loss" when a statute authorizes such orders).

14. U.S.S.G. § 3C1.1 (requiring a two-level increase if "(A) the defendant . . . attempted to obstruct or impede, the administration of justice during the course of the investigation, prosecution, or sentencing . . . and (B) the obstructive conduct related to (i) the defendant's offense of conviction and any relevant conduct; or (ii) a closely related offense").

Finally, the court applied a two-level downward departure, concluding that Phillips' crime was outside the heartland. Two primary considerations guided its decision. First, it read *Koon v. United States*[15] to allow consideration of Phillips' prior state prosecution. Second, it considered internal agency documents about environmental crimes and the CWA legislative history to determine the heartland of such crimes.

The district court sentenced Phillips to five years of probation, with a special condition that he serve three months of community confinement and three months of house arrest. It also required Phillips to pay $43,000.00 in restitution to Burgess. Phillips timely appealed his conviction and the Government cross-appealed the sentencing decisions.

## II. JURISDICTION AND STANDARD OF REVIEW

The district court had jurisdiction pursuant to 18 U.S.C. § 3231. We have jurisdiction pursuant to 28 U.S.C. § 1291.

We review *de novo* a district court's refusal to dismiss an indictment for lack of jurisdiction.[16] Whether a jury instruction misstates elements of a crime also receives *de novo* review.[17] Additionally, we review *de novo* the district court's interpretation of the sentencing guidelines.[18] However, we review a district court's factual findings

for clear error.[19] Although previous departures from the guidelines were reviewed for an abuse of discretion,[20] the recent passage of the Prosecutorial Remedies and Other Tools to End the Exploitation of Children Today Act of 2003 (the "PROTECT Act")[21] changes our review to *de novo*.[22] Finally, we review *de novo* the legality of a restitution order, but if the order is within the statutory bounds, we review the amount for abuse of discretion.[23]

## III. NAVIGABLE WATERS ISSUE

### A. *The District Court Correctly Refused to Dismiss the Indictment*

As Phillips' counsel acknowledged at oral argument, Phillips' decision to attempt to dismiss the indictment on jurisdictional grounds was based on the theory that, in criminal cases, the Government must show that the waters are navigable-in-fact. Phillips maintains his argument before this court.

The parties never disputed the physical characteristics of this creek. Instead, Phillips contends that, in construing "navigable waters," we must look to the meaning of "navigable waters" prior to Congress's original enactment of the CWA. Thus, for the district court to assert jurisdiction in a criminal case, the Government had to prove the creek was navigable-in-

---

**15.** 518 U.S. 81, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996).

**16.** *United States v. Neil*, 312 F.3d 419, 421 (9th Cir.2002).

**17.** *United States v. Patterson*, 292 F.3d 615, 629–30 (9th Cir.2002).

**18.** *United States v. Alexander*, 287 F.3d 811, 818 (9th Cir.2002).

**19.** *United States v. Shetty*, 130 F.3d 1324, 1333 (9th Cir.1997).

**20.** *Koon*, 518 U.S. at 91, 116 S.Ct. 2035.

**21.** Pub.L. No. 108–21, 117 Stat. 650 (Apr. 30, 2003).

**22.** *See* 18 U.S.C. § 3742(e)(4).

**23.** *United States v. Pizzichiello*, 272 F.3d 1232, 1240 (9th Cir.2001), *cert. denied*, 537 U.S. 852, 123 S.Ct. 206, 154 L.Ed.2d 84 (2002); *United States v. Laney*, 189 F.3d 954, 966 (9th Cir.1999).

fact. To resolve Phillips' claim, we must determine whether the district court correctly concluded, based on the undisputed facts, that the creek was a navigable water within the meaning of the CWA.

■ Federal Rule of Criminal Procedure 12(b)(3)(B) allows a defendant to contest jurisdiction in a pretrial motion to dismiss.[24] Phillips chose this path. He asserted that the creek was a tributary to a navigable water. The Government did not contest these facts. The court was thus faced with a pure issue of law, which it had to decide because no good cause existed to defer its ruling until trial.[25]

Thus, the court properly considered Phillips' pretrial jurisdictional challenge.

■ In reaching the merits of Phillips' motion, the district court correctly rejected Phillips' proposed construction of "navigable waters." The Army Corps of Engineers has long interpreted "navigable waters" in the CWA "to include not only actually navigable waters but also tributaries of such waters, interstate waters and their tributaries, and nonnavigable intrastate waters whose use or misuse could affect interstate commerce."[26] Indeed, "navigable waters" within the meaning of the CWA has encompassed tributaries for almost thirty years.[27] In *United States v. Riverside Bayview Homes, Inc.*,[28] the Su-

24. FED. R. CRIM. P. 12(b)(3)(B) (allowing the court to hear, "at any time while the case is pending, . . . a claim that the indictment . . . fails to invoke the court's jurisdiction").

25. FED. R. CRIM. P. 12(d) (requiring the court to "decide every pretrial motion before trial unless it finds good cause to defer a ruling"); *United States v. Shortt Accountancy Corp.*, 785 F.2d 1448, 1452 (9th Cir.1986) ("A pretrial motion is generally capable of determination before trial if it involves questions of law rather than fact.") (internal quotation marks omitted); *see also* FED. R. CRIM. P. 12(b)(2) (stating that"[a] party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial of the general issue"); *United States v. Hall*, 20 F.3d 1084, 1087 (10th Cir.1994) (noting that a district court may dismiss an indictment pretrial for insufficient evidence when the facts are essentially undisputed).

Phillips could have chosen to require the Government to prove that the creek was a navigable water at trial. In fact, he did require the Government to prove that the adjacent lands were wetlands. Rule 12 does not force Phillips to waive his jurisdictional argument if he failed to contest it pretrial. *See* FED. R. CRIM. P. 12(b)(3)(B). The CWA prohibits discharges *"into* navigable waters." Thus, whether the water is navigable is part of one element of a CWA violation. However, because he did not contest the facts, Phillips elected to resolve this issue pretrial in the hope that the district court would agree with his interpretation of the CWA and dismiss the

indictment for lack of jurisdiction. Because neither party contested the facts, the district court neither "invade[d] the province of the" jury nor determined an element of the offense. *See Shortt*, 785 F.2d at 1452; *see also United States v. Nukida*, 8 F.3d 665, 669–70 (9th Cir.1993).

26. *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 123, 106 S.Ct. 455, 88 L.Ed.2d 419 (1985); *see also United States v. Eidson*, 108 F.3d 1336, 1341–42 (11th Cir. 1997) (concluding that "courts repeatedly have recognized that tributaries to bodies of water that affect interstate commerce are [navigable waters]," even if not navigable-in-fact) (internal quotation marks omitted); *Headwaters Inc. v. Talent Irrigation Dist.*, 243 F.3d 526, 533 (9th Cir.2001) (concluding that irrigation canals are "waters of the United States" subject to the CWA because "they are tributaries to the natural streams with which they exchange water"); 40 C.F.R. § 122.2(a)-(c), (e) (1996) (defining "Waters of the United States" to include "interstate waters," streams that "could affect interstate or foreign commerce," and any tributaries of such waters).

27. *Riverside Bayview*, 474 U.S. at 123–24, 106 S.Ct. 455 (noting that the Corps adopted the broader interpretation of "navigable waters" in 1975).

28. 474 U.S. 121, 106 S.Ct. 455, 88 L.Ed.2d 419.

preme Court concluded that Congress acquiesced to the Corps' broad interpretation of "navigable waters." [29] "In 1987, after the Supreme Court decided [*Riverside Bayview*], Congress revised and replaced the criminal provisions of the CWA." [30] Congress did not change the "navigable waters" provision. Thus, even in a criminal case, we presume that Congress intended that the longstanding court and agency interpretation of "navigable waters" would govern. [31]

We conclude that, because the parties did not contest the facts, the district court appropriately resolved the jurisdictional challenge pretrial. The court also correctly rejected Phillips' overly restrictive interpretation of the CWA and, accordingly, correctly concluded that it retained jurisdiction.

B. *The District Court Correctly Instructed the Jury*

The district court's jury instructions were likewise appropriate. As we will explain, the instruction that the creek was a navigable water within the meaning of the CWA was the law of the case. By leaving to the jury the determination of where the crime occurred, the district court preserved Phillips' constitutional right to a jury determination of the elements of his crimes.

■ Phillips elected to resolve whether the creek was a navigable water on the basis of the uncontested facts pretrial. The law of the case doctrine precludes a court from reconsidering an issue that it has already resolved. [32] Issues that a district court determines during pretrial motions become law of the case. [33] In certain circumstances, a court retains discretion to depart from the law of the case. [34] However, none of those circumstances exist here. Thus, the district court would have abused its discretion if it had refused to abide by its previous ruling. [35]

■ The district court appropriately limited its jury instruction to protect Phillips' constitutional rights. [36] Because its instruction allowed the jury to decide *all of the issues* that the court had not previously resolved at Phillips' request, the district court did not invade the province of the jury. [37] The court left to the jury the

29. *Id.* at 135–37, 106 S.Ct. 455.

30. *Iverson,* 162 F.3d at 1024.

31. *See id.* (concluding, under similar circumstances, that the Supreme Court's interpretation of the "responsible corporate officer" provision would govern in a criminal case when the Court adopted that interpretation prior to Congress's revision of the criminal CWA provisions).

32. *United States v. Alexander,* 106 F.3d 874, 876 (9th Cir.1997).

33. *United States v. Cheely,* 814 F.Supp. 1430, 1434 (D.Alaska 1992).

34. *Alexander,* 106 F.3d at 876 (listing circumstances).

35. *Id.* at 876–77 (stating that"[t]he law of the case doctrine ordinarily precludes reconsider-ation of a previously decided issue" and that a district court's refusal to apply the doctrine "absent one of the requisite conditions constitutes an abuse of discretion").

36. *United States v. Gaudin,* 515 U.S. 506, 511, 115 S.Ct. 2310, 132 L.Ed.2d 444 (1995) (holding that "[t]he Constitution gives a criminal defendant the right to demand that a jury find him guilty of all the elements of the crime with which he is charged").

37. *See United States v. Jackson,* 436 F.2d 39, 42 (9th Cir.1970) (holding that where the parties do not dispute the facts and a conclusion does not depend on witness credibility, an instruction to the jury that a legal relationship is established does not involve a "significant abridgement of the right to jury trial; the jury's dispensing power—the power to decide against the law and the facts—remains intact"); *see also United States v. Coutchavlis,*

remaining portion of the CWA element that Phillips' pretrial motion left unresolved: the factual determination of whether the crime alleged occurred in the creek.[38] Thus, the district court allowed the jury to determine whether Phillips discharged pollutants *into* navigable waters.

The district court acted appropriately. We conclude that the district court's refusal to dismiss the indictment was proper. The district court's subsequent jury instruction was likewise correct. Therefore, we affirm Phillips' conviction.[39]

## IV. SENTENCING ISSUES

### A. *U.S.S.G. § 2Q1.3(b)(3) Substantial Expenditure Enhancement*

■ This circuit has not yet examined what a district court should include in its calculation of cleanup expenses to decide whether to enhance a sentence pursuant to U.S.S.G. § 2Q1.3(b)(3).[40] The district court decided to exclude CERCLA-related expenses, even if Phillips' activities released pre-existing contaminants into the environment. However, the text of the guidelines, the overall statutory scheme enacted by Congress, and other circuits' caselaw suggest that district courts should include such expenses in the calculation. Accordingly, we conclude that the district court must include any reliable CERCLA-related expenses in its U.S.S.G. § 2Q1.3(b)(3) calculation.

The plain language of U.S.S.G. § 2Q1.3(b)(3) supports our conclusion that the court must include reliable CERCLA expenses. Subsection (b)(3) provides: "If the offense resulted in disruption of public utilities or evacuation of a community, or if cleanup required a substantial expenditure, increase by 4 levels."[41] This language does not limit cleanup costs to those incurred pursuant to the statute of conviction. Rather, the subsection refers to cleanup generally. Therefore, we adopt the interpretation most consistent with the section's plain language:[42] a district court must include all reliable cleanup costs in its calculation of whether a defendant's

260 F.3d 1149, 1153–54 (9th Cir.2001) (rejecting defendant's argument that the Government failed to prove that the crime happened within Yosemite National Park because the court could have taken judicial notice of the fact that the only route defendant could have followed was entirely within the park's boundaries).

38. As the district court recognized, its instruction was similar to the determination of whether a crime occurred in an Indian reservation. *See, e.g., United States v. Sohappy*, 770 F.2d 816, 822 (9th Cir.1985) (concluding that the district court could properly determine that the location alleged was within the boundaries of an Indian reservation and then instruct the jury that they need only find the crime occurred in the location alleged); *see also United States v. Smith*, 282 F.3d 758, 767 (9th Cir.2002) ("A district court may determine as a matter of law the existence of federal jurisdiction over the geographic area, but the locus of the offense within that area is an issue for the trier of fact.") (internal quotation marks omitted).

39. Phillips' reliance upon the "rule of lenity" is misplaced. "Under [the rule of lenity], when a criminal statute is ambiguous, we interpret the statute in favor of the defendant." *Iverson*, 162 F.3d at 1025. However, it "applies only when there is grievous ambiguity or uncertainty in the statute and when, after seizing everything from which aid can be derived, we can make no more than a guess as to what Congress intended." *Id.* (internal quotation marks omitted). Phillips has not met and cannot meet this standard, so we decline to apply the rule of lenity in this case.

40. We have not addressed the issue pursuant to a similar provision, U.S.S.G. § 2Q1.2, which addresses toxic and hazardous pollutants.

41. U.S.S.G. § 2Q1.3(b)(3).

42. *Laney*, 189 F.3d at 959.

actions required a substantial expenditure for cleanup.

Our interpretation is also consistent with the scheme of environmental laws Congress has enacted. The areas of coverage of the major federal environmental laws overlap. CERCLA is the primary federal statute under which cleanups of contaminated sites proceed.[43] Thus, for an individual convicted under one statute, such as the CWA or the Resource Conservation and Recovery Act of 1976 ("RCRA"),[44] the Government may clean up the mess he made under CERCLA.[45] Because of this overlap, depriving the Government of cleanup costs because it proceeded under CERCLA, not the statute of conviction, would undermine the congressional scheme of environmental laws.

We draw additional support for our interpretation from our sister circuits, which have concluded that a calculation under U.S.S.G. § 2Q1.2, which is closely related to U.S.S.G. § 2Q1.3, should include all cleanup costs.[46] In particular, other circuits' cases support our conclusion that a district court should include CERCLA cleanup costs in its cleanup expenditure calculation.[47] In *United States v. Chau*,[48] despite the fact that the defendant was convicted of violating the Clean Air Act,[49] the Third Circuit concluded that a $200,000.00 CERCLA cleanup required a U.S.S.G. § 2Q1.2(b)(3) enhancement.[50] The *Chau* court held that the Government need only establish a connection between the cleanup costs and the defendant's criminal conduct, without regard to the

**43.** *See* Lauren E. Passmore, Note, *Reintroducing Equal Treatment in the "Toxic" Litigation Arena: An Exploration of the Factors Courts Utilize to Divide the Costs of Environmental Remediation*, 79 CORNELL L. REV. 1682, 1683–86 (1994) (providing an overview of the CERCLA process from discovery of contamination to contribution actions between responsible parties).

**44.** 42 U.S.C. §§ 6901–6992k. Congress enacted RCRA to provide a "cradle to grave" system for handling and storing hazardous wastes. *City of Chicago v. Envtl. Def. Fund*, 511 U.S. 328, 331, 114 S.Ct. 1588, 128 L.Ed.2d 302 (1994). RCRA provides criminal penalties for knowing violations of its provisions. 42 U.S.C. § 6928(d).

**45.** *See* Alyse Hakami, Comment & Case Note, *The RCRA/CERCLA Debate: Application of State Standards at Federal Hazardous Waste Sites*, 2 MO. ENVTL. L. & POL'Y REV. 158 (1995) (describing the overlapping coverage of RCRA and CERCLA).

**46.** *See, e.g., Eidson*, 108 F.3d at 1344–45 (concluding that "preliminary [site] examination [costs], which exceeded thirty thousand dollars, are properly considered cleanup costs"); *United States v. Bogas*, 920 F.2d 363, 369 (6th Cir.1990) (concluding that the district court should include all CERCLA costs in the substantial expenditure calculation, "includ[ing]

not only the direct cost of removal, but of site testing, studies, and similar response costs, direct and indirect") (internal quotation marks omitted).

**47.** *See Bogas*, 920 F.2d at 369 (concluding that, despite differences between CERCLA's civil remedial scheme and the criminal charges against the defendant, "the extent to which cleanup costs are recoverable under CERCLA provides a useful measure of the cleanup expenditures to be taken into account under U.S.S.G. § 2Q1.2(b)(3)"); *see also United States v. Cunningham*, 194 F.3d 1186, 1202 (11th Cir.1999) (concluding that language of U.S.S.G. § 2Q1.2 does not "limit[] its application to the costs of contamination cleanup per se; instead, it extends to any cleanup related to the offense"); *Eidson*, 108 F.3d at 1344–45 (concluding that excluding future costs would "thwart Congress's intent to punish defendants according to the level of environmental degradation caused by their criminal offenses" and that site examinations to make a reliable cleanup estimate were properly included as a cleanup cost).

**48.** 293 F.3d 96 (3d Cir.2002).

**49.** 42 U.S.C. §§ 7401–7671q.

**50.** *Chau*, 293 F.3d at 100.

source of the statutory costs.[51] The Third Circuit accordingly rejected the defendant's attempt to exclude CERCLA costs from the analysis.

*Chau* is factually similar to this case. Phillips' actions similarly disturbed pre-existing pollutants and may have increased their disbursement into the environment.[52] Individuals may incur CERCLA expenses to clean up and stabilize the disruption Phillips caused.[53] Therefore, as in *Chau*, the fact that Phillips did not place the pollutants at the site is of no consequence.[54]

We hold that the district court must include all reliable costs of cleanup, even if not incurred under the statute of conviction, in its substantial cleanup expenditure analysis. The plain language of U.S.S.G. § 2Q1.3(b)(3), the overlapping coverage of major federal environmental laws, and other circuits' caselaw all support our holding. Therefore, we must vacate Phillips' sentence and remand to allow the district court to make the necessary calculation armed with our interpretation of U.S.S.G. § 2Q1.3(b)(3).

## B. *U.S.S.G. § 3C1.1 Obstruction of Justice Enhancement*

■ The district court erroneously concluded that U.S.S.G. § 3C1.1 required the Government to show more than that Phillips attempted to influence Zinger. We hold that § 3C1.1's enhancement is triggered when a defendant attempts to influence a witness. Therefore, we remand to the district court to allow it to analyze whether Phillips' conduct was an attempt to influence Zinger.

Application note 4, subsection (a) of U.S.S.G. § 3C1.1 covers a defendant's attempt to influence a witness.[55] Under this subsection, the obstruction of justice enhancement applies to "threatening, intimidating, *or otherwise unlawfully influencing* a co-defendant, witness, or juror, directly or indirectly, or *attempting to do so*."[56]

The district court refused to enhance Phillips' sentence because his conduct did not materially impede the investigation. However, the guidelines do not require materiality when a defendant attempts to influence a witness. Although application note 4, subsection (g), contains a materiality requirement, it applies to the *defendant's own* false statements.[57] Thus, the significant obstruction and materiality requirements of application note 4, subsection (g), do not apply to a defendant's *attempt to influence* a witness.

---

51. *Id.* (requiring that the Government show that defendant's "criminal acts ... led in part to the expenditure of [CERCLA] monies").

52. *Id.* ("Here, there is substantial evidence that Chau disturbed the asbestos in the building [and] that some asbestos became exposed to the air.").

53. *Id.*

54. *Id.*

55. *United States v. Collins,* 90 F.3d 1420, 1429–30 (9th Cir.1996).

56. U.S.S.G. § 3C1.1, cmt. n. 4(a) (emphasis added); *see also United States v. Sayetsitty,* 107 F.3d 1405, 1410 (9th Cir.1997) (holding that "[t]he prosecution was not required to prove that [the defendant] actually obstructed justice; a showing of attempt is sufficient," and concluding a signal to a witness during testimony fell within subsection (a)); *United States v. Powell,* 973 F.2d 885, 894 (10th Cir.1992) ("A defendant need not actually threaten the witness; he need only *attempt to influence* them.") (emphasis added).

57. For a defendant's statements to require an obstruction of justice enhancement, the statements must be "materially false" and must "significantly obstruct[ ] or impede[ ]" the investigation or prosecution. U.S.S.G. § 3C1.1, cmt. n. 4(g).

### C. *U.S.S.G. § 5K2.0 Heartland Departure*

The Government challenges the district court's heartland analysis because it: (1) considered Phillips' prior state prosecution and (2) considered internal agency memoranda and legislative history. We hold that the district court's heartland analysis was flawed due to its consideration of these factors.

■ Subsequent to the district court's decision, Congress enacted the PROTECT Act,[58] which provides that a district court's decision to apply downward departures, an area previously reviewed for an abuse of discretion, must instead be reviewed *de novo*.[59] In agreement with our sister circuits who have decided the issue,[60] we conclude that the PROTECT Act's new standard of review applies to cases pending on appeal at the time of its enactment and thus applies to Phillips' sentence.

The PROTECT Act instructs this court to "review de novo the district court's application of the guidelines to the facts" if either

the district court failed to provide the written statement of reasons [newly] required by section 3553(c) [or] the sentence departs from the applicable guideline range based on a factor that—(i) does not advance the objectives set forth in section 3553(a)(2); or (ii) is not authorized under section 3553(b); or (iii) is not justified by the facts of the case.[61]

Nothing in this section of the PROTECT Act implicitly or explicitly limits its application to cases pending on appeal. We conclude that the new standard of review must be applied in any case decided by this court subsequent to the PROTECT Act's effective date of April 30, 2003. "[A]ppellate review of [Phillips'] sentence lay in the future as of April 30, 2003, so we must apply the new standard of review."[62]

■ We do not agree with Phillips' contentions that application of the PROTECT Act's new standard of review will violate the Ex Post Facto Clause, the Due Process Clause, or constitutional protections ensuring the separation of powers. The Ex Post Facto Clause applies only to "penal" legislation, which encompasses four traditional categories, none of which include a change in the standard of review upon appeal.[63] Procedural changes such

---

**58.** Pub.L. No. 108–21, 117 Stat. 650 (Apr. 30, 2003).

**59.** 18 U.S.C. § 3742(e)(4).

**60.** *See United States v. Bell,* 351 F.3d 672, 674–75 (5th Cir.2003) (reasoning that a change in the standard of review is procedural rather than substantive, and concluding that the Act's *de novo* standard of review may be applied to cases, like the instant one, in which sentencing occurred before the Act's enactment date); *United States v. Hutman,* 339 F.3d 773, 775 (8th Cir.2003) (holding that "[a] change in the standard of review is properly characterized as procedural rather than substantive [and therefore can be applied to a pending appeal without violating the Ex Post Facto Clause] because it neither increases the punishment nor changes the elements of the offense or the facts that the government must

prove at trial") (quoting *United States v. Mejia,* 844 F.2d 209, 211 (5th Cir.1988)); *United States v. Jones,* 332 F.3d 1294, 1299 n. 5 (10th Cir.2003) (applying the altered review standard of the PROTECT Act retroactively, without objection from either party); *United States v. Mallon,* 345 F.3d 943, 946–47 (7th Cir. 2003) (stating that "[p]rocedural innovations that don't tinker with substance as a side effect are compatible with the ex post facto clause. [The new standard of review] of the PROTECT ACT is procedural only and thus must be used on this appeal").

**61.** 18 U.S.C. §§ 3742(e)(3)-(4).

**62.** *Mallon,* 345 F.3d at 946.

**63.** *See Calder v. Bull,* 3 Dall. 386, 390, 1 L.Ed. 648 (1798).

as the PROTECT Act's new standard of review do not fall under the purview of the Ex Post Facto Clause.[64]

■ Neither does application of the new standard violate the Due Process Clause. Phillips argues that he held "a legitimate and reasonable expectation that there' would be an established degree of appellate deference to the departure granted by the District Court that oversaw his proceedings below." Reliance on a particular standard of appellate review, however, does not implicate the Due Process Clause. Phillips did not rely upon the former standard of review at the time he committed the crime for which he was convicted. He may have expected that a higher level of deference would be shown to the district court's sentencing determinations, but that fact should have prompted him to present his evidence *more* carefully at trial in the event that the district court's decision was adverse to him. Phillips' potential reliance interest on the former standard of review when making the decision to file an appeal is not substantial enough to warrant protection by the Due Process clause. "Because rules of procedure regulate secondary rather than primary conduct, the fact that a new procedural rule was instituted after the conduct giving rise to the suit does not make application of the rule at trial retroactive."[65] The standard of appellate review to be applied in a particular instance is just such a rule of procedure,

merely regulating secondary conduct.[66] Thus, the Due Process clause does not bar application of the rule to a case pending on appeal.

■ Finally, application of the PROTECT Act's new standard of review does not violate constitutional protections ensuring a separation of powers between the legislative and judicial branches. The power to determine the appropriateness of the application of downward departures remains with the judiciary. While a slightly higher degree of discretion has been granted to this court, this discretion has in no way been usurped by another branch of government. The PROTECT Act's new standard of review does not raise separation of powers concerns.

We conclude that the PROTECT Act's standard of review provision applies to cases pending on appeal at the time of the Act's enactment. Accordingly, we review *de novo* the district court's decision to apply a downward departure to Phillips' sentence.

*Koon* provides the framework for a district court's departure from the guideline range. "Congress allows district courts to depart from the applicable Guideline range if the court finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Com-

---

**64.** *Dobbert v. Florida*, 432 U.S. 282, 293, 97 S.Ct. 2290, 53 L.Ed.2d 344 (1977); *see also Mallon*, 345 F.3d at 947.

**65.** *Landgraf v. USI Film Products*, 511 U.S. 244, 275, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994) (citation omitted).

**66.** *See Mallon*, 345 F.3d at 946 (stating that the new standard of review of the PROTECT Act does not affect any substantive rights or crucial settled expectations because it

does not change the statutory penalties for crime, affect the calculation of the Guidelines range, or alter the circumstances under which departures are permitted. It changes *who* within the federal judiciary makes a particular decision, but not the legal standards for that decision.... An increase in the number of judges who must consider an issue reduces the variance of the decisionmaking but should not affect the mean or median outcome.

(emphasis in the original)).

mission...."[67] However, "[t]o determine whether a circumstance was adequately taken into consideration by the Commission, Congress instructed courts to *consider only the sentencing guidelines, policy statements, and official commentary of the Sentencing Commission.*"[68] The district court violated this mandate by considering internal agency memoranda and legislative history,[69] "a factor that ... is not authorized under section 3553(b)."[70] "[T]he proper comparison is between the conduct of the defendant and the conduct of other offenders ... sentenced pursuant to the same Guideline."[71] The district court did not make this comparison. Even were we to apply the prior, more deferential standard of review, the district court exceeded the bounds imposed by Congress, the Supreme Court, and this circuit.

■ Phillips' prior state prosecution, during which he was merely fined, cannot alone justify the district court's application of a downward departure.[72] In contrast to the defendants in *Koon*,[73] who endured a full trial, Phillips endured merely a post-indictment, pre-prosecution negotiation in which he agreed to pay a fine. The state agreed not to prosecute if he paid the fine, which he did. Even the defendants in

*Koon* met with only lukewarm affirmation by the Supreme Court of the district court's application of a downward departure for prior prosecutions.[74] Significantly, Justices Souter, Ginsburg, and Breyer dissented in *Koon*, stating that they felt the application of downward departures based on the defendants' prior prosecutions could not even be upheld under the more deferential abuse of discretion standard of review.[75] The combination of the less deferential standard of review now mandated by the PROTECT Act and of Phillips' minimal negative consequences from his prior state prosecution leads this court to conclude that a downward departure was not warranted on the basis of Phillips' prior prosecution.

■ The district court improperly considered internal agency memoranda and legislative history in its heartland analysis, and the minimal legal activity Phillips endured on the state level does not merit a downward departure. We accordingly vacate Phillips' sentence.

D. *U.S.S.G. § 5E1.1 Restitution Determination*

■ . In denying restitution to the EPA, the district court concluded that the Gov-

---

67. *Koon*, 518 U.S. at 92, 116 S.Ct. 2035 (internal quotation marks omitted).

68. *Id.* at 92–93, 116 S.Ct. 2035 (internal quotation marks omitted) (emphasis added).

69. *See United States v. Stevens*, 197 F.3d 1263, 1268 (9th Cir.1999) (reversing where district court examined the harms Congress sought to address and "then decid[ed] the extent to which Defendant contributed to those harms"); *see also id.* ("Why Congress enacted a particular substantive criminal statute ordinarily is not relevant in answering the question whether *what this defendant actually did* is typical of what other offenders do when violating the law in question.") (emphasis in original).

70. 18 U.S.C. § 3742(e)(3)(B)(ii).

71. *Stevens*, 197 F.3d at 1268.

72. *See United States v. Sewell*, 252 F.3d 647, 653 (2d Cir.) (upholding district court's refusal to grant departure on the ground of successive prosecution when facts of the case were not as severe as those faced by the *Koon* defendants), *cert. denied*, 534 U.S. 968, 122 S.Ct. 382, 151 L.Ed.2d 291 (2001).

73. 518 U.S. at 112, 116 S.Ct. 2035. Officer Koon was convicted for beating Rodney King after he was prosecuted and acquitted at the state level.

74. *See id.*

75. *Id.* at 114–18, 116 S.Ct. 2035.

ernment was not a victim in this case and that the costs of investigation were not recoverable under U.S.S.G. § 5E1.1. We hold that site investigation costs may be recoverable through restitution orders. We therefore remand to the district court to allow it to make a restitution determination consistent with our opinion.

■■■ The guidelines require district courts to order restitution "for the full amount of the victim's loss" when a statute authorizes such orders.[76] This language is broad and supports the conclusion that the Government can be a victim for restitution purposes.[77]

To determine whether the Government may receive restitution, we must explore the dividing line between criminal investigation costs (which are not recoverable) and other investigation costs (which may be recoverable).[78] This circuit has adopted a broad view of the restitution authorization. We ask whether the costs were in-

curred as a "direct and foreseeable result" of the defendant's wrongful conduct.[79] Therefore, the critical question is this: On which side of the dividing line do the costs in this case fall?

*United States v. Salcedo–Lopez*[80] teaches us that the costs of gathering evidence solely for a criminal investigation are not directly related to the crime.[81] However, *Salcedo–Lopez* recognizes that "[w]hen the government loses money as the *direct result of an offense,* it is as entitled to restitution as any other victim." [82] A site investigation to determine what damage the defendant's conduct caused and to design an appropriate cleanup plan is likely not a routine matter in all such criminal cases.[83] Rather, the Government incurs such expenses as a direct result of the *offense,* not as a direct result of the criminal prosecution. In such situations, "investigation costs are a . . . subset of cleanup costs" and recoverable to the same extent.[84]

76. U.S.S.G. § 5E1.1(a)(1).

77. *United States v. Lincoln,* 277 F.3d 1112, 1113–14 (9th Cir.2002); *United States v. Helmsley,* 941 F.2d 71, 101 (2d Cir.1991).

78. *Compare United States v. Cummings,* 281 F.3d 1046, 1051–53 (9th Cir.) (holding that district court properly included in the restitution order mother's attorney's fees from separate state and international proceeding to recover her children that defendant wrongfully removed), *cert. denied,* 537 U.S. 895, 123 S.Ct. 179, 154 L.Ed.2d 162 (2002); *and United States v. Piggie,* 303 F.3d 923, 928 (8th Cir.2002) (concluding, under plain error review, that district court properly included in a restitution order investigative fees and fines University incurred because they were caused by the defendant's conduct), *cert. denied,* 538 U.S. 1049, 123 S.Ct. 2114, 155 L.Ed.2d 1090 (2003), *with United States v. Salcedo–Lopez,* 907 F.2d 97, 97–99 (9th Cir.1990) (holding that the "costs of investigating and prosecuting an offense are not direct losses for which restitution may be ordered" and, accordingly, rejecting the Government's attempt to recover money a confidential informant paid to the

defendant to obtain false documents); *United States v. Mullins,* 971 F.2d 1138, 1147 (4th Cir.1992) (holding that a district court may not include "attorney's and investigators' fees expended to recover [fraudulently acquired] property" in a restitution award).

79. *Cummings,* 281 F.3d at 1052.

80. 907 F.2d 97.

81. *Id.* at 98–99.

82. *Id.* at 99 n. 2 (emphasis added).

83. *See United States v. Menza,* 137 F.3d 533, 539 (7th Cir.1998) (remanding for consideration of whether DEA's chemical disposal costs "were matters of routine policy and procedure within the agency, which may prevent recovery, or whether the costs incurred were unique to this case and accrued solely and directly as a result of[the defendant's] criminal conduct").

84. *Cf. Albany Bank & Trust Co. v. Exxon Mobil Corp.,* 310 F.3d 969, 974 (7th Cir.2002)

Therefore, the Government is entitled to restitution for site investigation costs if they are not routinely incurred prosecuting criminal cases but instead are a "direct and foreseeable result" of the Government's mitigation of the damage Phillips caused. Accordingly, we must remand to allow the district court to determine which, if any, of the Government's investigation costs properly fall within this category.

## V. CONCLUSION

The district court appropriately concluded that the creek was a navigable water within the meaning of the CWA and so instructed the jury. Phillips chose to resolve this issue pre-trial on uncontested facts. The court appropriately rejected Phillips' overly restrictive interpretation of the CWA. As a tributary to a navigable water, the creek was a "navigable water" under the CWA.

The court's instruction to the jury was likewise proper. Its earlier ruling on the pretrial motion was law of the case. The court's instruction preserved Phillips' constitutional rights because it left to the jury all previously unresolved portions of the navigable waters element. Thus, the district court left to the jury the crucial factual question, whether Phillips discharged pollutants "*into* navigable waters." Therefore, we affirm Phillips' conviction.

However, we must vacate Phillips' sentence and remand for re-sentencing. The district court must include reliable CERCLA-related expenses when it decides whether Phillips' conduct caused a substantial cleanup expenditure. The district court must also limit its obstruction of justice inquiry to whether Phillips' con-

versation with Zinger was an attempt to influence Zinger. The court should not consider internal agency memoranda and legislative history in its heartland analysis. Finally, any restitution order should include site investigation costs that are a direct and foreseeable result of the offense, rather than of the criminal prosecution.

Conviction AFFIRMED; sentence VACATED and REMANDED for re-sentencing.

(concluding that, because RCRA does not allow recovery of cleanup costs via its citizen suit provision, the plaintiff also could not recover investigation costs in its private suit against the polluter); *Menza,* 137 F.3d at 539

(concluding that investigation into possible environmental contamination of crime scene was properly included, but only to the extent that it was non-duplicative).