In the

# United States Court of Appeals

## For the Seventh Circuit

No. 03-2049

UNITED STATES OF AMERICA,

*Plaintiff-Appellant,*

*v.*

JOHN S. MALLON,

*Defendant-Appellee.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 02 CR 217—**Joan B. Gottschall**, *Judge.*

ARGUED SEPTEMBER 18, 2003—DECIDED SEPTEMBER 18, 2003
OPINION ISSUED OCTOBER 6, 2003

Before EASTERBROOK, DIANE P. WOOD, and EVANS, *Circuit Judges.*

EASTERBROOK, *Circuit Judge.* John Mallon, a citizen of the United Kingdom residing in Northern Ireland, pleaded guilty to the crime of using the means of interstate and international communication in an effort to entice a female under the age of 18 to engage in sexual activity. See 18 U.S.C. §2422(b). The admissions that accompanied Mallon's plea, plus uncontested facts adduced at sentencing, show that, beginning in early February 2002, he attempted to entice Marny, who represented herself to be 14 years old, into a sexual liaison. Mallon's initial contact with Marny was made by computer, through an Internet

chat room, from Mallon's home in Belfast. After Marny rejected Mallon's initial overtures, he continued sending her email messages boasting of his sexual experience (including a tryst with a 15-year-old girl in Florida) and assuring Marny that he would provide both financial and psychological support, serving as a father substitute. (Marny said that her father had abandoned her.) Telephone conversations followed. Marny finally agreed to meet Mallon on March 8, 2002, and Mallon flew to Chicago for that purpose.

As the acting head of the Ulster-Scots Agency, an organization created by Northern Ireland's Good Friday Agreement, Mallon had been scheduled to be at the White House in Washington, D.C., on March 11 for an official ceremony. He came to the United States early, and via Chicago, in order to engage in sexual relations with Marny, who he called promptly after his plane touched down at O'Hare Airport. When Marny arrived at Mallon's hotel, he tried to hug and kiss her but did not get far—for "Marny" was just the assumed name of an agent, and Mallon was soon under arrest. (Both sides had been lying in the chat room and email exchanges. Mallon claimed to be a wealthy businessman, 47 years old, single, with no children. Actually he was 61 years old, married for 40 years with 5 children and 10 grandchildren, and after 24 years in the civil service had retired in 1995 to become a consultant. He volunteered for post-retirement work managing the Ulster-Scots Agency.) Mallon's hotel room contained condoms, a video camera set up to record the encounter, and a gold necklace that he had planned to give Marny. Constables who later searched Mallon's home found numerous sexually graphic communications between Mallon and other girls who represented that they had not reached the age of 16.

After all adjustments, Mallon's offense level was 22, which led to a sentencing range of 41 to 51 months' impris-

onment. Nonetheless, the district judge fixed Mallon's sentence at 21 months. She gave two principal reasons for this departure from the prescribed range. First, she concluded that Mallon's heart condition had caused "a severely diminished capacity to make good judgments", justifying a four-level departure under U.S.S.G. §5K2.13. Second, she stated that "a group of factors, including but not limited to defendant's deportable alien status," justified a further two-level reduction. That produced a new offense level of 16 and a range of 21 to 27 months' imprisonment.

The United States filed a notice of appeal; Mallon did not take a cross-appeal and does not contest the original offense level of 22 (though he stoutly defends the district court's downward departure to a level of 16). About a month before oral argument, the prosecutor learned that, with good-time credits, Mallon would be released from the 21-month sentence the day before oral argument and could be removed from the United States swiftly there-after. The prosecutor filed a motion asking us to stay this removal. For the reasons given in Appendix A to this opinion, we denied this motion and suggested that the Department of Justice take the matter up with the Department of Homeland Security. Apparently time did not allow the issue to percolate up to senior officials, but a local immigration officer took the position that Mallon had a legal entitlement to be returned to the United Kingdom immediately after release from prison. There followed a second motion, this time seeking a brief delay in release. That motion was granted (see Appendix B), and on the afternoon following oral argument we issued a decision (see Appendix C). This opinion explains that judgment.

Mallon's principal submission is not that we must agree with the district judge as an original matter, but that we may ask only whether the judge abused her discretion. That deferential standard of appellate review is

specified by *Koon v. United States*, 518 U.S. 81, 92-100 (1996). More recently, however—and after the district judge pronounced Mallon's sentence—Congress amended 18 U.S.C. §3742(e)(4), the provision on which *Koon* relied. Until last April, that statute required appellate judges to "give due deference to the district court's application of the guidelines to the facts." Section 401(d) of the Prosecutorial Remedies and Tools Against the Exploitation of Children Today Act of 2003 (PROTECT ACT), Pub. L. No. 108-21, 117 Stat. 650, amends §3742(e) to provide:

> Upon review of the record, the court of appeals shall determine whether the sentence— . . .
>
>> (3) is outside the applicable guideline range, and
>>
>>> (A) the district court failed to provide the written statement of reasons required by section 3553(c);
>>>
>>> (B) the sentence departs from the applicable guideline range based on a factor that—(i) does not advance the objectives set forth in section 3553(a)(2); or (ii) is not authorized under section 3553(b); or (iii) is not justified by the facts of this case; or
>>>
>>> (C) the sentence departs to an unreasonable degree from the applicable guidelines range, having regard for the factors to be considered in imposing a sentence, as set forth in section 3553(a) of this title and the reasons for the imposition of the particular sentence, as stated by the district court pursuant to the provisions of section 3553(c); . . . .
>
>> . . .

> The court of appeals shall give due regard to the opportunity of the district court to judge the credibility of the witnesses, and shall accept the findings of fact of the district court unless they are clearly erroneous and, except with respect to determinations under subsection (3)(A) or (3)(B), shall give due deference to the district court's application of the guidelines to the facts. With respect to determinations under subsection (3)(A) or (3)(B), the court of appeals shall review de novo the district court's application of the guidelines to the facts.

So although resolutions of contested issues of fact stand unless clearly erroneous, with respect to departures on one of the grounds listed in §3742(e)(3)(B) "the court of appeals shall review de novo the district court's application of the guidelines to the facts." If after independent consideration the court of appeals finds a departure justified, then the extent of the departure must be reviewed deferentially under *Koon*'s standard; that's the effect of omitting §3742(e)(3)(C) from the last sentence of the amended statute.

The amendment became effective on April 30, 2003, when the President signed the enrolled bill. What becoming "effective" means may depend on the nature and timing of the affected matters. For example, §401(g) of the PROTECT ACT limits to two the number of levels a district judge may subtract for the defendant's acceptance of responsibility, unless the prosecutor consents to the subtraction of a third level. Mallon received a three-level reduction for his guilty plea, a step authorized by the Guidelines in force at the time, and the prosecutor sensibly does not contest it now. New laws presumptively operate prospectively and do not alter the legal consequences of completed acts. See, e.g., *Landgraf v. USI Film Products*, 511 U.S. 244 (1994). But appellate review of

Mallon's sentence lay in the future as of April 30, 2003, so we must apply the new standard of review. See *United States v. Thurston*, 338 F.3d 50, 69-72 (1st Cir. 2003).

Not so, Mallon replies. He contends that application *would* be retroactive—indeed, would violate the Constitution's ex post facto clause—because it would alter the consequences of his completed criminal conduct. Yet §401(d) of the PROTECT ACT does not change the statutory penalties for crime, affect the calculation of the Guidelines range, or alter the circumstances under which departures are permitted. It changes *who* within the federal judiciary makes a particular decision, but not the legal standards for that decision. Instead of one district judge, three appellate judges now decide whether a departure is justified. An increase in the number of judges who must consider an issue reduces the variance of decisionmaking but should not affect the mean or median outcome.

Justice Chase offered in *Calder v. Bull*, 3 U.S. (3 Dall.) 386, 390 (1798), what has become the canonical definition of an ex post facto law. "1st. Every law that makes an action done before the passing of the law, and which was innocent when done, criminal; and punishes such action. 2d. Every law that aggravates a crime, or makes it greater than it was, when committed. 3d. Every law that changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed. 4th. Every law that alters the legal rules of evidence, and receives less, or different, testimony, than the law required at the time of the commission of the offence, in order to convict the offender." See also, e.g., *Stogner v. California*, 123 S. Ct. 2446, 2449-55 (2003); *Carmell v. Texas*, 529 U.S. 513, 539 (2000). The punishment that "the law" annexed to Mallon's crime—which is to say, the statutory maximum—is unchanged. The Sentencing Guidelines, which likewise stand unchanged, are not "laws"

in the first place. See *United States v. Johnson*, 335 F.3d 589 (7th Cir. 2003); *Scott v. United States*, 997 F.2d 340 (7th Cir. 1993). Only §3742(e), which allocates authority between district and circuit judges, has been affected. Procedural innovations that don't tinker with substance as a side effect are compatible with the ex post facto clause. *Dobbert v. Florida*, 432 U.S. 282 (1977); *Beazell v. Ohio*, 269 U.S. 167 (1925). Section 401(d) of the PROTECT ACT is procedural only and thus must be used on this appeal.

The district court's four-level departure for "severely diminished capacity to make good judgments" was based on U.S.S.G. §5K2.13, which provides: "A sentence below the applicable guideline range may be warranted if the defendant committed the offense while suffering from a significantly reduced mental capacity." This ground of departure is unavailable if "the facts and circumstances of the defendant's offense indicate a need to protect the public because the offense involved actual violence or a serious threat of violence"; the prosecutor does not contend that Mallon's crime "involved actual violence or a serious threat of violence". Instead the prosecutor's position is that the record does not establish "significantly reduced mental capacity." We must accept the district court's findings of fact unless they are clearly erroneous, but even this deferential standard does not shelter a finding (which is at best implicit) that Mallon had in February and March 2002 a mental condition disposing him to pedophilia.

Mallon suffers from heart disease. In 1993 he had a heart attack, followed by quadruple bypass surgery. In December 2001 he had another heart attack, after which a stent was inserted into one artery. He takes medication: beta blockers, blood thinners, and cholesterol reducers. One major artery has only 20% of normal flow. Tony Allen Fletcher, a clinical neuropsychologist, gave evidence

(via affidavit) that Mallon's heart problems have led to a mental deterioration that curtails his ability to resist impulses and causes him to act strangely. Yet Fletcher, who is not a cardiologist, did not refer to any medical literature establishing or even suggesting that heart disease causes (or removes inhibitions against) pedophilia. (Fletcher's report does not mention *any* scholarly literature, whether descriptive or empirical.) Although Fletcher observed that vascular problems can cause hypoxia, which may alter behavior, he did not conduct the tests that would have been necessary to determine whether Mallon suffered from hypoxia during the critical times (or, indeed, has ever suffered from that condition). Fletcher stated that Mallon had reported some delusions and hallucinations (reports Fletcher believed), but he did not discuss whether Mallon had been delusional during the time of the offense, whether these delusions could have led to the offense Mallon committed, or whether the established changes in Mallon's behavior (he became withdrawn and disorganized during 2000 and 2001) affected his propensity to commit crimes. No one in his family, or at the Ulster-Scots Agency, thought at the time that Mallon needed mental-health intervention.

The prosecutor offered evidence from Dr. Stephen Dinwiddie, a psychiatrist, calling Fletcher's reasoning into question. Dinwiddie noted that Mallon had not shown any signs of mental abnormality that might be caused by oxygen deficiency during the seven years after his bypass surgery in 1993. Dinwiddie continued: "Fletcher's speculation that [Mallon's] cardiac condition might have played a role also seems unlikely. If the cause of such periods of confusion and so forth were . . . his prior myocardial infarction and bypass grafting, any remaining cognitive effects would have been of long standing by [2002]. If, on the other hand, some acute episode had caused hypoxemia shortly before February 6, 2002, [the date of

Mallon's initial contact with Marny,] it is dubious at best that it could have caused such cognitive problems in the absence of classical symptoms of coronary artery disease such as those Mr. Mallon had experienced before. Such episodes also tend to either resolve or worsen over a shorter period of time than the weeks in question." The district court did not discuss these shortcomings in Fletcher's analysis of Mallon's condition or analyze the significance of the fact that Mallon began to inveigle underage girls in mid-2001, five or six months before his second heart attack.

It is awfully hard to describe the crime to which Mallon confessed as the result of poor "impulse control." Mallon communicated with Marny for more than a month and crossed the Atlantic Ocean to meet her. He knew that what he was doing was wrong; Mallon advised Marny not to tell her mother what was going on and to delete from her computer all copies of the communications. And although Fletcher likely was right to conclude that Mallon suffers from mental disorder of *some* kind, that would be so of almost every person today who sets out to deceive and have sexual relations with underage girls he has never met. Departures are designed to accommodate the abnormal case, not the person whose problems are common among those who commit the crime in question.

The two-level departure for a "combination of factors" is weaker still. All of the "factors" but one reflect Mallon's nationality: he will be in prison far from his family; he may be ineligible for transitional release, such as a halfway house, in the concluding months of his sentence; once the sentence ends, an alien may spend time in custody awaiting removal. The only factor unrelated to Mallon's citizenship is his health: he suffers from skin cancer as well as heart disease and, although the district judge believed these to be as treatable in prison as outside, she thought that they would make imprisonment more stress-

ful. None of these reasons, individually or in combination, justifies a departure. In the past we have disapproved departures on grounds similar to those the district court invoked, but the deferential standard of review precluded closing the door entirely. See, e.g., *United States v. Gallo-Vasquez*, 284 F.3d 780 (7th Cir. 2002); *United States v. Krilich*, 257 F.3d 689 (7th Cir. 2001); *United States v. Guzman*, 236 F.3d 830 (7th Cir. 2001); *United States v. Farouil*, 124 F.3d 838 (7th Cir. 1997). Section 401(d) shifts to the court of appeals the decision whether to depart. We hold that departure on the grounds the district judge gave is unwarranted. Combining circumstances that individually do not warrant departure does not alter the outcome.

Age and health are subjects covered by the Guidelines. Section 5H1.1 says that age is not a basis for departure unless the defendant is "elderly and infirm" (which Mallon does not claim to be), and §5H1.4 adds that only an "extraordinary physical impairment" justifies departure on health grounds for persons not yet "elderly". We concluded in *Krilich* that an impairment is "extraordinary" when medical treatment within the institution would be markedly inferior to that available outside, or when the medical condition is one that shortens the life span of institutionalized persons compared with those at liberty. The district court found that Mallon does not satisfy these conditions; he does not argue otherwise.

As for Mallon's nationality: §5H1.10 provides that national origin is not relevant to the sentence. Citizenship often differs from national origin, but, as we observed in *Vasquez* and its predecessors, a departure based on alienage has the effect of reducing sentences for persons whose national origin is outside the United States. Consider the fact that any prison in the United States is far from Mallon's friends and family in Northern Ireland. Distance reduces the frequency of visits, which may make custody

more onerous—yet many a U.S. national serves time far from friends and family. A defendant whose family lives in Maine may be confined in California. Why should a resident of Northern Ireland get a break denied to a resident of Maine? It is also important not to exaggerate the effects of alienage. The district judge expressed concern that Mallon could be held in custody for months, following expiration of his sentence, until his return to Northern Ireland. Delay is likely, however, only when the person opposes removal; immigration officials were prepared to repatriate Mallon the day after his release.

What is more, both the United States and the United Kingdom adhere to the Convention on the Transfer of Sentenced Persons (the Strasbourg Convention). See 35 U.S.T. 2867, implemented at 18 U.S.C. §§ 4100-15. Under the Strasbourg Convention, prisoners may be transferred to their home countries for service of sentence. As far as we can see, Mallon is eligible for transfer under the Convention but has not sought its benefits. Prisoners eligible for transfer under the Strasbourg Convention are poorly situated to complain about the distance to their relatives, about diminished access to transitional release in the United States, and about the potential for extra detention pending removal. Service of sentence in one's native country eliminates all of these problems.

A prisoner who is ineligible for transfer, and as a result of alienage becomes ineligible for transitional release, suffers a real disadvantage. This may be the basis of a departure, but the discount must not exceed the detriment. Congress has authorized the Bureau of Prisons to move prisoners into halfway houses or equivalent facilities for the last 10% of their sentences. 18 U.S.C. 3624(c). For Mallon, that would have been the last four months of a 41-month term under the Guidelines. (It is unclear whether the Bureau of Prisons would use this option for a prisoner convicted under §2422(b); we assume that it would,

without deciding whether that is so.) Halfway houses are, as the name suggests, facilities that hold their charges in custody part of the time (usually nights and weekends) while releasing them during working hours, so they can begin employment and start the transition to a life of freedom. Four months in a halfway house may be equivalent to two months in a prison. Thus a district court might logically trim a sentence from 41 to 39 months so that the citizen and the alien suffer equal disutility from the conviction. The district judge's two-level departure, by contrast, cut the low end of the range from 41 months to 33 months. If it turns out on remand that Mallon cannot be transferred to the United Kingdom under the Strasbourg Convention, and if a U.S. citizen convicted under §2422 would be eligible for transitional placement under §3624(c), then the district court would be authorized to depart from the range by two months. Otherwise, however, the Guidelines' range must be respected.

Throughout the hearing that preceded the imposition of sentence, the district judge made it clear that she views the Guideline range of 41 to 51 months as too severe for a person such as Mallon, who before setting out to troll the Internet for young girls had been a model citizen. The judge stressed that he led a life of good works both as a civil servant and in his community, and that he helped to heal the religious rift in Northern Ireland. Moreover, Mallon has experienced shame, a loss of standing in the community, a decline in future consulting income, and other injuries that serve as punishments on top of a prison term; many other violators of §2422 will not experience these losses to the same degree, so imposition of a Guideline-based prison sentence means that Mallon's total punishment may exceed the norm for this offense.

The difficulty, as the district court recognized, is that the Sentencing Guidelines declare considerations of these

kinds inappropriate as reasons for sentence reductions, see §5H1.11, unless the crime may be called "aberrant behavior" within the scope of §5K2.20. Mallon's conduct was "aberrant" in the lay but not the legal sense. The Sentencing Commission defines the term as "a single criminal occurrence or single criminal transaction that (A) was committed without significant planning; (B) was of limited duration; and (C) represents a marked deviation by the defendant from an otherwise law-abiding life." U.S.S.G. §5K2.20 Application Note 1. Mallon satisfied subpart (C), and perhaps (B), but not (A). This crime was *elaborately* planned. Perhaps the Sentencing Commission should afford district judges more latitude under §5K2.20 to recognize the good a person has done in life, and to adjust sentences on account of shame, lost income, and other kinds of extra-legal punishment. Under the Guidelines as they stand, however, a departure could not be based on §5K2.20, and restrictions deliberately placed on the aberrant-behavior departure may not be circumvented.

VACATED AND REMANDED

Appendix A

Order issued August 22, 2003:

The United States, which has taken an appeal seeking a higher sentence in this criminal case, has filed a motion for a stay of Mallon's removal to Northern Ireland, a step that may well occur before the end of September. The United States represents that Mallon will be released from prison on September 17, the day before oral argument, and will immediately be taken into administrative custody pending removal—which, given his felony conviction, is likely to be swift. The United States contends that removal should be stayed so that an order by this court increasing the length of Mallon's lawful sentence could be implemented without using the cumbersome extradition process to retrieve him from Northern Ireland following removal.

Neither the prosecutor's request, nor the defendant's response, remarks the strangeness of one Cabinet department (the Department of Justice) asking the judiciary to block another (the Department of Homeland Security) from acting. Why is this request being made via the judiciary, rather than from one Cabinet officer to another? Disagreements within the Executive Branch should be resolved by the President and his subordinates, not by the Judicial Branch. They are justiciable only if one of the contestants is an independent agency (whose members cannot be summarily removed) or some equivalent promise of independence has been made. See *United States v. Nixon*, 418 U.S. 683, 692-97 (1974).

Because the request was made to the Judicial Branch, however, it is essential to establish the requirements of judicial action, such as jurisdiction. Given 8 U.S.C. §1252(g), it is impossible to see how we could block the execution of a removal order whose validity is uncontested. See *Reno v. American-Arab Anti-Discrimination Committee*,

525 U.S. 471 (1999). What is more, even if we had jurisdiction, a stay would be appropriate only if there were some probability that the removal order would be set aside, and the Department of Justice does not say that removal would be unlawful. Courts do *not* issue stays of valid administrative orders on general equitable grounds, as the Department of Justice asks us to do. The Department is quick to protest when a private litigant makes such a request.

The Department of Justice's request for a delay of removal should be addressed to the Department of Homeland Security (and perhaps to the State Department, whose portfolio includes extradition), not the Judicial Branch.

What a court might do, perhaps, is delay the handover of Mallon from the Bureau of Prisons to the Bureau of Immigration and Customs Enforcement. Such an order, giving the Department of Justice the authority to keep Mallon in its own custody, would be similar to a stay of release pending appellate review of a district court's order issuing a writ of habeas corpus, or it could be analogized to pre-sentencing detention following conviction, cf. *United States v. Krilich*, 178 F.3d 859 (7th Cir. 1999). It could be proper if the United States is likely to succeed on its appeal. Apparently a delay of even one day would enable this court to announce a decision on the merits on the day of oral argument. A single day's delay could be justified without meeting an especially steep burden. The motion for a stay of removal accordingly is denied, but without prejudice to the filing of a proper motion for a delay of release from the Bureau of Prisons' custody. Before filing such a motion, however, the United States should try to resolve this matter within the Executive Branch.

Appendix B

Order issued September 16, 2003:

John Mallon is scheduled for release from prison on September 17, 2003, the day before oral argument in this court. The United States contends that Mallon should have received a sentence within the range of 41 to 51 months' imprisonment, as opposed to the actual sentence of 21 months that has led to the currently calculated release date. In light of the imminence of oral argument, the problems potentially created by discontinuous periods of custody, and the fact that the United States' appeal seeks only to ensure compliance with the Sentencing Guidelines (it does not request an upward departure), Mallon should remain in custody until the appeal is resolved. We will endeavor to announce a decision promptly after argument.

Accordingly, the Bureau of Prisons is directed to maintain Mallon in its custody pending further order of the court.

Appendix C

Decision issued September 18, 2003:

The judgment of the district court is vacated, and the case is remanded with instructions to increase Mallon's sentence under the Sentencing Guidelines. Pending resentencing, Mallon must remain in the custody of the Bureau of Prisons. See *United States v. Krilich*, 178 F.3d 859 (7th Cir. 1999). In due course the court will issue an opinion explaining this decision. Issuance of our mandate will be deferred until then. The time to seek rehearing is hereby extended, so that any petition is due 14 days from the date on which our opinion is issued.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*