

2005 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

1-5-2005

# USA v. Cooper

Precedential or Non-Precedential: Precedential

Docket No. 03-2854

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2005

Recommended Citation

"USA v. Cooper" (2005). *2005 Decisions.* Paper 1541.
http://digitalcommons.law.villanova.edu/thirdcircuit_2005/1541

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2005 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 03-2854

_____

UNITED STATES OF AMERICA
Appellant

vs.

FRED E. COOPER

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

(D.C. Criminal No. 02-cr-00192-1)
District Judge:  The Honorable William L. Standish

_____

ARGUED  MARCH 11, 2004

BEFORE: SLOVITER and NYGAARD, <u>Circuit</u> <u>Judges</u>.
and SHADUR,[*] <u>District</u> <u>Judge</u>.

(Filed: January 5, 2005)

Bonnie R. Schlueter, Esq.
Mary Beth Buchanan, Esq.
Christine A. Sanner, Esq. (Argued)
Office of United States Attorney
700 Grant Street, Suite 400
Pittsburgh, PA 15219

―――――――――――

*Honorable Milton I. Shadur, Senior District Judge for the United
States District Court for the Northern District of Illinois, sitting by
designation.

Counsel for Appellant

William F. Boyer, Esq. (Argued)
Sharp and Associates
2020 K Street, N.W., Suite 475
Washington, DC 2006
                Counsel for Appellee

_____

O R D E R
_____

NYGAARD, Circuit Judge.

The opinion of the court filed in this appeal on December 23, 2004 as well as the dissenting opinion authored by Judge SLOVITER, are hereby VACATED and the foregoing majority and dissenting opinions are to be filed in its place.

It is so ordered.

/s/ Richard L. Nygaard
United States Circuit Judge

2

<u>PRECEDENTIAL</u>

THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 03-2854

_____

UNITED STATES OF AMERICA

Appellant

vs.

FRED E. COOPER

_____


ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

(D.C. Criminal No. 02-cr-00192-1)
District Judge:  The Honorable William L. Standish

_____

ARGUED  MARCH 11, 2004

BEFORE: SLOVITER and NYGAARD, <u>Circuit</u> <u>Judges</u>.
and SHADUR,[*] <u>District</u> <u>Judge</u>.

_____

*Honorable Milton I. Shadur, Senior District Judge for the United
States District Court for the Northern District of Illinois, sitting by
designation.

(Filed   January 5, 2005 )

Bonnie R. Schlueter, Esq.
Mary Beth Buchanan, Esq.
Christine A. Sanner, Esq. (Argued)
Office of United States Attorney
700 Grant Street, Suite 400
Pittsburgh, PA 15219
          Counsel for Appellant

William F. Boyer, Esq. (Argued)
Sharp and Associates
2020 K Street, N.W., Suite 475
Washington, DC 2006
          Counsel for Appellee

————————

OPINION OF THE COURT

————————

NYGAARD, Circuit Judge.

Appellee, Fred Cooper, pleaded guilty to one count of securities fraud, in violation of 15 U.S.C. § 78j(b) and 18 U.S.C. § 2, and to one count of making and subscribing to a false tax return, in violation of 26 U.S.C. § 7206(1).  He also accepted responsibility for under-reported income.  The District Court sentenced him to thirty-six months probation, including six months house arrest, after granting him a downward departure based on his charitable works and

donations. The government appeals this sentencing decision, and we will affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Sentencing is essentially a fact-driven analysis, even under the standards announced in Prosecutorial Remedies and Tools Against the Exploitation of Children Today Act of 2003 ("PROTECT Act"), Pub.L. No. 108-21, 117 Stat. 650. Our review of sentences imposed by a district court is likewise driven by the particular factual background of each case. We must therefore first turn our attention to the undisputed evidence presented to the District Court in the present case.

Cooper is the former CEO and CFO of Biocontrol Technology, Inc. ("BICO"), a publicly-traded Pennsylvania corporation engaged in the development of medical devices. Under Cooper, BICO stock lost 98.5 percent of its value, declining to a mere $.05 per share. Eventually, BICO declared bankruptcy, leaving thousands of shareholders, including Cooper himself, with worthless stock. And yet ironically, while at BICO, Cooper received valuable bonuses in the form of warrants to purchase stock, in addition to his

5

substantial salary, which doubled from just under $600,000 in 1996 to $1.3 Million by 2000. In 1994 he exercised some of these warrants, generating $321,217 in taxable income. Although he did not sell the stock and thus receive actual cash income from it, the tax code required Cooper to report the exercise of the warrants as income. He did not do so. Nor did he report the fact that he pledged these warrants as collateral for personal loans. Between 1995 and 1997, Cooper continued to exercise warrants, generating $891,153 in taxable income—albeit without actual cash realization—which he again failed to report. As a result, his total unpaid tax liability for 1994 through 1997 was approximately $487,000.

In addition, in 1996 Cooper and two other BICO officers pledged BICO certificates of deposit as collateral for three personal loans totaling $623,000 without getting approval from the BICO board of directors. Although required by law to report these actions to the Securities and Exchange Commission, Cooper did not do so, thereby misleading the investing public about BICO's financial condition.

6

For his failure to fully report his 1994 income, Cooper pleaded guilty to one count of making and subscribing to a false tax return, in violation of 26 U.S.C. § 7206(1). For his failure to report the use of the certificates of deposit, Cooper also pleaded guilty to one count of securities fraud, in violation of 15 U.S.C. §§ 78j(b) and 18 U.S.C. § 2. As part of the terms of his plea agreement, Cooper accepted responsibility for the under-reported income in his tax returns between 1995 and 1997.

At the sentencing hearing, several witnesses testified on Cooper's behalf, including: Cooper's oldest son, Garrett; two men from a church in Aliquippa; Alonzo Roebuck, a young man Cooper helped through high school and college; and former Pittsburgh Steeler Mel Blount, who runs a boys' home in Pennsylvania. The District Court also received twenty-four letters concerning Cooper, most pleading for leniency. The witnesses and letters described a variety of Cooper's charitable donations and activities. They recount his generosities with both his money and his time for the benefit of others. Specifically, the evidence showed that Cooper engaged in the following "good works":

1) For twenty-seven years Cooper threw an annual Christmas party for underprivileged children, buying them valuable gifts with his own money.

2) He founded and funded, at an unknown cost, an area athletic organization entitled "Athletes Against Drugs and Violence," and provided equipment for the organization.

3) He organized two youth football teams—one of which included his son—and went into inner-city Pittsburgh to offer kids the chance to participate, driving many of them back and forth to the suburbs for practice.

4) He donated his own money to enable four boys who participated on one of the football teams to leave their inner-city school and attend a better school in the suburbs. He also donated money to help some of them through college.

5) He extensively mentored Roebuck, one of the boys on Cooper's football team. Cooper frequently invited Roebuck to his house and helped him with family and school problems. Roebuck went on to graduate from college, and attributes his success to Cooper's intervention.

6) He arranged for BICO to make donations to several charities for two computer learning centers in depressed areas, to the Allegheny County Special Olympics, and to Pittsburgh's Mercy Foundation. At Cooper's behest, BICO also sponsored a charity event to raise money.

7) He helped advise the Mel Blount Youth Home.

The presentence report gave Cooper a base offense level of seventeen. The government recommended a three-level reduction for acceptance of responsibility. With a corresponding score of fourteen and a criminal history category of I, the guidelines sentencing range

8

suggested a term of fifteen to twenty-one months in prison. However, Cooper filed a motion seeking a two-level downward reduction on the grounds that the tax loss tables overstated the seriousness of his offense, arguing that he had never received any actual income from the undeclared stocks. He also sought a three-level downward departure in recognition of his community and charitable events.

The District Court denied Cooper's request for a departure on the basis of the overstated seriousness of the offense, but granted a four-level departure for his charitable activities—one level more than he had requested. Accordingly, the District Court sentenced Cooper to thirty-six months probation, including six months house arrest. From the bench the District Court explained its reasons for departure as follows:

> I think his community and charitable activities have been truly exceptional, and that's just not the amount of money he spent on the things, but also the amount of personal effort, and work, and help that he has given to so many people, starting long before the criminal investigation began in this case. Therefore, resulting in a downward departure, going to be four levels in this case on that basis. . . .
>
> Now, the reason for the imposition of this sentence is as follows. A sentence of three years' probation, with the condition of six months' home detention, reflects

9

> the seriousness of the offenses in this case [and] takes into consideration the extensive charitable work that has been done by Mr. Cooper before and since the investigation began . . . which resulted in the present charges. And the three years probation addresses the sentencing goals of punishment and deterrence.

App. at 169, 174. The government appeals from the District Court's downward departure.

## II. DISCUSSION

### A. *The PROTECT Act and the Standard of Review*

When signed into law in April of 2003, the PROTECT Act brought about several fundamental changes in federal sentencing law. For instance, the Act: prohibits downward departures based on new grounds on remand; requires a government motion as a condition for the grant of a level reduction for extraordinary acceptance of responsibility; and reduces the number of federal judges on the United States Sentencing Commission from at least three of the seven members to no more than three. *See* PROTECT Act, Pub. L. No. 108-21, § 401. Presently relevant though, is the provision amending 18 U.S.C. § 3742(e). Before that particular amendment, the Courts of Appeal did not review a downward departure decision *de novo*, but instead asked whether the sentencing court abused its discretion in

10

granting the departure. *Koon v. United States*, 518 U.S. 81, 91 (1996). Now, however, the Courts of Appeal must engage in *de novo* review, not only of a district court's ultimate decision to depart, but also of its "application of the guidelines to the facts." 18 U.S.C. § 3742(e). If a departure is warranted, then the *extent* of the departure granted by the district court is still reviewed under the pre-PROTECT Act abuse of discretion standard. *United States v. Dickerson*, 381 F.3d 251, 264 (3d Cir. 2004) ("[W]e are to continue to apply an abuse of discretion standard as we review the extent of departures that have been properly granted."); *United States v. Frazier*, 340 F.3d 5, 14 n.4 (1st Cir. 2003); *see also United States v. Mallon*, 345 F.3d 943, 946 (7th Cir. 2003); *United States v. Jones*, 332 F.3d 1294, 1300 (10th Cir. 2003). As for a district court's findings of fact, our standard of review remains unchanged, and we review them for clear error. *Dickerson*, 381 F.3d at 261.

The PROTECT Act also requires a sentencing judge to explain any departure from the guidelines "with specificity in the written order of judgment and commitment." 18 U.S.C. § 3553(c)(2). Although here the District Court did not issue written reasons for its

11

grant of a departure, it did explain its reasoning orally. We agree with the other Courts of Appeal that have concluded that failing to provide a written explanation for a departure is not cause for remand if the departure is otherwise permissible and the district court's reasoning is persuasive. *See United States v. Santiago*, 2004 WL 2049754, at *5 (2d Cir. Sept. 15, 2004); *United States v. Daychild*, 357 F.3d 1082, 1107–08 (9th Cir. 2004); *United States v. Orchard*, 332 F.3d 1133, 1141 (8th Cir. 2003).

B.      *Application of the De Novo Standard of Review to the Downward Departure*

The District Court granted Cooper a downward departure based on his good works. The sentencing guidelines discourage departures for good works. *United States v. Thurston*, 358 F.3d 51, 78. (1st Cir. 2004). Only when those works are "exceptional" do the guidelines permit them to serve as a basis for departure. *Id*. at 78–79. Whether good works qualify as exceptional is evaluated with reference to the offender's wealth and status in life. *See id*. at 80. More is expected of "high-level business executives" who enjoy "sufficient income and community status so that they have the

12

opportunities to engage in charitable and benevolent activities." *United States v. Haversat,* 22 F.3d 790, 796 (8th Cir. 1994). Indeed, "it is usual and ordinary, in the prosecution of similar white-collar crimes involving high-ranking corporate executives . . . to find that a defendant was involved as a leader in community charities, civic organizations, and church efforts." *United States v. Kohlbach,* 38 F.3d 832, 838 (6th Cir. 1994). Moreover, we must be mindful that individuals "who donate large sums because they can should not gain an advantage over those who do not make such donations because they cannot." *Thurston*, 358 F.3d at 80. The relevant inquiry, therefore, is not whether Cooper performed charitable works, but whether those works, as found by the District Court, "were exceptional enough to overcome the judgment of the Sentencing Commission that a record of good works is a discouraged basis for departure." *Id*. at 79.

We begin our analysis with the evidence of good works presented to the District Court. Like many similarly-situated defendants, Cooper presented evidence of financial donations he made personally and had BICO make to various charitable

13

organizations. Were this Cooper's only evidence of good works, we would not affirm the downward departure. Cooper, however, presents more.

He organized and ran a youth football team in a depressed area of Pittsburgh. Not only did he coach the young men who participated, he became their mentor as well. Cooper even went so far as to pay for four of the players on the team, including Roebuck, to attend a suburban high school where they would find better opportunities. And it was Cooper who expended the effort to find a school that would accept the boys as a group, ensuring that they could adjust to the new setting together. In addition, Cooper helped Roebuck go to college: First to the University of Pittsburgh, and when he did not get enough playing time on the University's football team, then to Edinboro University of Pennsylvania. Roebuck graduated from Edinboro after a successful four years of athletics and academics, and he attributes his success to Cooper. These are not the detached acts of charity one might ordinarily expect from a wealthy business executive. They are, in a very real way, hands-on personal

14

sacrifices, which have had a dramatic and positive impact on the lives of others.

Moreover, when compared with a similarly-situated defendant who received a downward departure based on good works, Cooper fares well. In *United States v. Serafini*, 233 F.3d 758 (3d Cir. 2000), we affirmed a downward departure for a wealthy state legislator who mentored a young man with a disability.[1] Serafini encouraged the young man to attend college and loaned him tuition money. *Id*. at 774. The young man eventually became an attorney, and attributed his success to the defendant. *Id*. We explained that the defendant's good works were *personal* in nature, thereby "distinguishing his acts from the impersonal writing of checks that is the norm for many wealthy individuals." *Id*. at 776. Cooper's good works, specifically as they relate to Roebuck, are no less personal and substantial. He mentored the underprivileged young man, who later attributed his

---

[1]We decided *Serafini* before the new standard of review required by the PROTECT Act. While we noted that our review of the decision to depart was—at that time—deferential, at no point did we intimate that we would have reversed the departure if our review was *de novo* as it is now. *See Serafini*, 233 F.3d at 775. On the contrary, we explained that the decision to grant a downward departure was not clearly out of line with other then-existing reported cases. *Id*. (citing *United States v. Woods*, 159 F.3d 1132, 1136 (8th Cir. 1998)).

success to Cooper. Cooper also paid for not one, but four young men to attend a high school together where they would have a better opportunity to succeed. These acts are qualitatively different from the detached donation of money. They are more personal, and we find them to be exceptional.

We must acknowledge, however, that there exists case law that is seemingly to the contrary. In *United States v. Morken*, 133 F.3d 628 (8th Cir. 1998), the Eighth Circuit reversed a downward departure for a high-profile businessman who advised local businesses, hired young people, served on his church council, and raised money for charity. In *United States v. Thurston*, the First Circuit held that a downward departure could not stand for a wealthy businessman who, *inter alia*, took both family members and others into his home for several weeks, tithed ten percent of his income, and devoted several hours a week for unpaid service to his church. 358 F.3d at 51. These cases, however, are either distinguishable or unpersuasive.

*Morken* is distinguishable for the same reason that we distinguished it in *Serafini*: the good works by the defendant in

16

*Morken* were "somewhat impersonal" in nature. *Serafini*, 233 F.3d at 775. By contrast, here, as in *Serafini*, Cooper did not merely donate money or serve in an advisory role in the community. Among other things, he took it upon himself to mentor Roebuck and others—a sacrifice of a personal nature.

It is true that the good works in *Thurston* could also be construed as personal in nature—at least so far as the defendant took others into his home for several weeks—and thus that case would be more difficult to distinguish. However, we find *Serafini* to be more presently analogous. As we have already explained, in *Serafini* we found the defendant's act of mentoring—to which a young man attributed his success—to be an extraordinary good work. Cooper mentored Roebuck and others in a similar fashion, and Roebuck attributes his success to Cooper. We fail to see why Cooper's good works were any less extraordinary than those in *Serafini*.

We are aware of the fact that Cooper's failure to make accurate reports to his shareholders contributed to the misconceptions that they held about BICO's financial health. We are also mindful of the fact that thousands of shareholders lost millions of dollars when

17

the value of BICO's stock plummeted. Downward departures for good works, however, are permissible when the works are exceptional. Cooper's good works are exceptional, and we agree with the District Court's grant of a downward departure. For these same reasons, and considering the deference we must give to the District Court's decision regarding the extent of the downward departure, we will affirm the District Court's order granting Cooper a four-level downward departure.

United States v. Fred E. Cooper

No. 03-2854

SLOVITER, Circuit Judge, dissenting.

**I.**

My colleague, Judge Nygaard, in his fair, dispassionate opinion for the majority, has accurately described the relevant facts, and even the applicable law, to be considered in this appeal. However, I cannot join the majority's conclusion that a millionaire defendant, who has admitted to both securities fraud, in violation of 15 U.S.C. §§ 78j(b) and 18 U.S.C. § 2, and filing a false income tax return, in violation of 26 U.S.C. § 7206(1), should be able to avoid even the short imprisonment which the Sentencing Guidelines direct. The majority reaches that conclusion by approving the District Court's grant of a downward departure for good works, a reason discouraged by the Sentencing Guidelines. I find persuasive instead the Government's argument on its appeal that the grant of a downward departure and the extent of that departure were unwarranted.

The initial issue to consider is our scope of review of the District Court's decision to depart downward. Unlike the previous law, when we deferred to the District Court's sentencing discretion, the PROTECT Act mandates de novo review. This reflects Congress' concern with the number of downward departures granted by the district courts and its belief that lenient sentencing can best be remedied by the appellate courts. See 149 Cong. Rec. H2420-2424 (daily ed. Mar. 27, 2003) (statement of Rep. Feeney) ("Although the guidelines continue to state that departures should be very rare occurrences, they have in fact proved to be anything but. . . . [District] Judges

who dislike the Sentencing Reform Act and the sentencing guidelines now have significant discretion to avoid applying a sentence within the range established by the commission, and it is difficult for government to effectively appeal such cases."); PROTECT Act, H.R. Conf. Rep. No. 108-66, at 59 (2003), reprinted in 2003 U.S.C.C.A.N. (117 Stat.) 683, 694 (stating that "this section would . . . change the standard of review for appellate courts to a de novo review to allow appellate courts more effectively to review illegal and inappropriate downward departures"); see also Letter from Jamie E. Brown, Acting Assistant Attorney General, U.S. Dep't of Justice, Office of Legislative Affairs, to Orrin G. Hatch, Chairman, Committee on the Judiciary, U.S. Senate (Apr. 4, 2003), reprinted in 149 Cong. Rec. S5,127-28 (daily ed. Apr. 10, 2003) ("The bill would make it easier for the Government to appeal illegal downward departures by requiring appellate courts to undertake a de novo review of departure decisions."); see generally Andrew D. Goldstein, Note, What Feeney Got Right: Why Courts of Appeal Should Review Sentencing Departures De Novo, 113 Yale L.J. 1955 (2004).

As the Court of Appeals for the First Circuit recognized, the PROTECT Act reflects, in part, Congress' "disinclination towards leniency for white collar criminals" and its frustration with the fact that these defendants receive probation more often than other offenders who commit crimes of comparable severity. See United States v. Thurston, 358 F.3d 51, 79 (1st Cir. 2004); see also Testimony of then Sentencing Commissioner Stephen Breyer Before the Senate Committee on the Judiciary, Oct. 22, 1987, reproduced in 146 PLI/Crim 811, 824 (1987) ("The Commission considers present sentencing practices, in which white collar criminals receive probation more often than other offenders who committed crimes of comparable severity, to be unfair."). Although the majority recognizes the changed standard of review, see also United States v. Dickerson, 381

F.3d 251, 262 (3d Cir. 2004), I believe it has failed to apply it to the situation before us.

Cooper is the paradigmatic white collar criminal. While CEO of Biocontrol Technology, Inc., he failed to report $891,153 in income and, in addition, he pledged the company's certificates of deposit as collateral to secure his personal loans without securing the approval of the company's Board and without making the required disclosure to the SEC. Cooper's offense level was set at 14, resulting from a base offense level of 17 with a three-level reduction for acceptance of responsibility and a criminal history of I. The consequent sentencing range was fourteen to twenty-one months imprisonment, which was the presumptive sentence that Cooper should have been required to serve.

Instead, undoubtedly seeking to avoid any imprisonment for the crimes that he committed, Cooper sought two downward departures, one for a three-level reduction for good works and the other a two-level reduction on the ground that the tax tables overstated the seriousness of his offense. The District Court denied the two-level reduction, and Cooper does not challenge that ruling on appeal. However, Cooper's argument about his charitable donations and activities persuaded the District Court to depart downward. Notwithstanding that Cooper had sought only a three-level downward departure on that ground, the District Court granted a four-level downward departure, thereby insuring that Cooper, an admitted criminal, would serve no prison time.

We review the extent of the departure for abuse of discretion. Although I believe, unlike my colleagues in the majority, that a fair de novo review requires reversal of the decision to depart downward, I also believe that, in the exercise

of our discretion, we should overturn the District Court's departure at a level beyond even that requested by Cooper.

## II.

In <u>United States v. Serafini</u>, 233 F.3d 758 (3d Cir. 2000), we stated that in order to be entitled to a downward departure for good works, a defendant's civic service, charity, and philanthropy must be "beyond the norm," i.e., "exceptional," for a person with his or her resources who had obtained the equivalent station in life. <u>Id.</u> at 775. Cooper's were not. Rather, considering Cooper's former status as the head of a large, publicly-traded corporation, his service and charity were merely typical for someone in his position. <u>United States v. Thurston</u>, 358 F.3d 51, 78-80 (1st Cir. 2004); <u>United States v. Haversat</u>, 22 F.3d 790, 796 (8th Cir. 1994).

The majority concludes, and I agree, that Cooper's monetary donations to various charitable organizations cannot, standing alone, support a downward departure. Rather, as noted by the United States Court of Appeals for the First Circuit, "[t]hose who donate large sums because they can should not gain an advantage over those who do not make such donations because they cannot." <u>Thurston</u>, 358 F.3d at 79; <u>see also</u> <u>Serafini</u>, 233 F.3d at 775 ("Since [defendant] is a wealthy individual, we must ensure that a district court does not run afoul of the prohibition against considering socioeconomic differences in relying on financial contributions as a basis for departure."); <u>United States v. Tocco</u>, 200 F.3d 401, 434 (6th Cir. 2000) (noting that allowing downward departures on basis of defendant's monetary contributions would run afoul of not only the Guidelines but also of "the ancient concept of justice that a man of wealth, position, power, and prestige should not be given special consideration in the law"); <u>United States v. McHan</u>, 920 F.2d 244, 248 (4th Cir. 1990) ("[T]o allow any affluent offender

22

to point to the good his money has performed and to receive a downward departure from the calculated offense level on that basis is to make a mockery of the Guidelines."). Indeed, as the Government points out, for the most part the financial contributions for which Cooper seeks credit were made by the corporation, not by Cooper personally. Thus, the majority recognizes that we must focus on Cooper's direct personal contributions, rather than on his more detached acts of donating money.

The majority and I part ways in our evaluation of Cooper's personal contributions and service to his community. The principal activity relied upon by the majority is Cooper's organization and running of a football team for the benefit of youth in an economically depressed neighborhood of Pittsburgh and the fact that, through this involvement, Cooper came to serve as mentor to several of the young players. In particular, Cooper became an active part in the life of Alonzo Roebuck, a young man Cooper helped through high school and then college.[2]

Undoubtedly, Cooper's contributions assisted greatly in the lives of these young people – his efforts certainly are to be applauded. Nonetheless, Cooper's actions were not beyond the norm; it cannot be said that Cooper's civic acts were in any way "extraordinary" when compared to other cases involving similarly-situated defendants presenting charitable acts. See, e.g., United States v. Neil, 903 F.2d 564, 566 (8th Cir. 1990) ("Neil has . . . coached young athletes in his community, but there is nothing in these activities to distinguish Neil from other defendants who can make the same showing."); United States v. Jordan, 130 F. Supp. 2d 665, 673 (E.D. Pa. 2001) (finding, despite defendant's apparent position "as a mentor and role model for youth in his neighborhood," that defendant's "civic, charitable, and public service and other good works, while

---

[2] The majority also recounts Cooper's work with the Mel Blount Youth Home, his annual Christmas party for underprivileged children, and his work with Athletes Against Drugs and Violence.

23

commendable, are not so exceptional or extraordinary for a person in [the defendant's] circumstances as to warrant a downward departure").

Cooper's work with Roebuck and the other youths, although certainly laudable, cannot be considered atypical for individuals occupying Cooper's station in life. Many, if not most, of these activities were undertaken while Cooper was an executive of a corporation that receives publicity and goodwill as a result. In <u>Thurston</u>, the court noted that business leaders "are often expected, by virtue of their positions to engage in civic and charitable activities." <u>Thurston</u>, 358 F.3d at 79. In other words, although Cooper's actions certainly benefitted the targeted youths, they also benefited Cooper's corporation and ultimately therefore, Cooper himself. It is also notable that Cooper did not begin some of his charitable work until after the inception of the investigation that led to the instant conviction; for example, he did not offer to advise the Mel Blount Youth Home until "the early part of 2000." App. at 111. This timing, of course, calls into question the true impetus undergirding Cooper's charity.

Nor can we overlook the testimony of Cooper's son, Garrett Lee Cooper, that although his father personally drove the inner-city youth to his affluent neighborhood for football practice, he did so, at least in part, so that Garrett – himself engaged in sports – could practice with individuals that the Coopers perceived as more formidable players. <u>See</u> App. at 133 ("One, the selfish feeling that my father wanted me to play with the talented attributes that Alonzo and his friends had. Because, if you want to be good in sports, you need to play with these types of kids.").

The majority relies in large part on our decision in <u>Serafini</u> where we upheld a downward departure. The majority recognizes that <u>Serafini</u> was decided before enactment of the PROTECT Act, but it relegates that point to a footnote and appears not to have absorbed the changed standard of review in its analysis. I believe Congress intended that we scrutinize departures, such as that given in this case, more strictly than the

24

majority does here. It is time that this court, like our colleagues on the First Circuit, absorbs and applies the PROTECT Act's intention that the under-sentencing of white collar criminals should cease.

Finally, Cooper provided the District Court with no facts whatsoever that would allow for any accurate estimation of how much personal time he actually spent involved in civic service. See generally United States v. McDowell, 888 F.2d 285, 291 (3d Cir. 1989) (noting that "when the defendant is attempting to justify a downward departure, it is usually the defendant who bears the burden of persuasion"). Rather, Cooper's evidence respecting the time commitment imposed by his charitable activities sounds merely in vague generalities. It offers no basis for a finding that Cooper's charitable activities required a significant, let alone exceptional, forfeiture of his time. Cf. United States v. Tocco, 200 F.3d 401, 434 (6th Cir. 2000).

I believe that considered in perspective of his position in life, Cooper's charitable works do not serve to place his situation "'outside the heartland'" of the Sentencing Guidelines. United States v. Dickerson, 381 F.3d 251, 264 (3d Cir. 2004) (quoting Koon v. United States, 518 U.S. 81, 96 (1996)). Rather, although Cooper's community service is certainly worthy of praise, it cannot be considered atypical. United States v. Morken, 133 F.3d 628, 630 (8th Cir. 1998) ("Although laudable, [defendant's] record of good works is neither exceptional nor out of the ordinary for someone of his income and preeminence."). In sum, therefore, I conclude that Cooper's civic activities provided insufficient grounds for the District Court's downward departure. For these reasons, I must respectfully dissent.